FRIDGE CONSTRUCTION COMPANY, INC., and Johnny F. Smith Truck and Dragline Service, Inc., a Joint Venture, Plaintiffs,

v.

The FEDERAL EMERGENCY MANAGE-MENT AGENCY (the United States), Defendant/Third–Party Plaintiff/Cross–Claim Plaintiff.

The CITY OF PASCAGOULA, MISSIS-SIPPI, and the City of Ocean Springs, Mississippi, Defendants/Cross–Claim Defendants,

v.

STATE OF MISSISSIPPI, Third Party Defendant.

Civ. A. No. S88–0472(G).

United States District Court, S.D. Mississippi, S.D.

Sept. 17, 1991.

Samuel C. Kelly, William R. Purdy, Kent McDaniel, Jackson, Miss., for plaintiffs.

Robert E. Sanders, Jackson, Miss., for State of Miss.

Crockett Lindsey, Donald M. Waits, Asst. U.S. Atty., Biloxi, Miss., for FEMA.

Melvin Mitchell, Pascagoula, Miss., for City of Pascagoula.

Karl Wiesenburg, Pascagoula, Miss., for City of Pascagoula, City of Ocean Springs.

Oscar R. Jordan, Ocean Springs, Miss., William T. Reed, Pascagoula, Miss., for City of Ocean Springs.

## BENCH OPINION

GEX, District Judge.

This cause came on for trial before the Court without a jury on April 22, 1991. The Court, having fully considered the testimonial and documentary evidence presented by both parties at trial, the arguments of counsel, and the applicable law, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure:

### Findings of Fact

#### I. Introduction

After teasing the Mississippi Gulf Coast in the late summer of 1985, Hurricane Elena approached the western coast of Florida. Then, Elena abruptly departed Florida's waters for the Mississippi coast again.

Finally, on September 2, 1985, Elena struck the Mississippi coast concentrating its fury on Jackson and Harrison Counties. Fortunately, Elena's impact was not preceded by the deadly tidal surge which ordinarily accompanies such storms. Nevertheless, Elena's high winds and tornadoes spawned by the ferocious storm did do substantial damage. However, the plaintiff's suffering did not begin until after the cleanup was underway.

## II. *Federal Emergency Management Agency's Initial Involvement*

This litigation arises out of federal, state, and local governmental efforts to respond to Hurricane Elena. Paul Hall has held the position of Chief of Disaster Assistance Program Division for the Southeast Region since 1981. Hall stated that in 1985, he had a public assistance officer, Mel Schneider, and an individual assistance officer. According to Hall, Schneider's responsibilities include coordinating and providing assistance to communities, local governments, and state governments. Hall further testified that Schneider normally has four full-time employees and that reservists, disaster assistance employees (DAE), are activated when disaster assistance is needed. After awakening one morning to learn that Elena had landed in Mississippi, Hall and Schneider stated that they and Mr. Polney, another Federal Emergency Management Agency (FEMA) employee, drove to the Mississippi coast where they proceeded along U.S. Highway 90 from Pascagoula to Hancock County to survey the damage. Hall testified he contacted his national office and informed them of the damage. According to Hall, he contacted his own office in Atlanta and requested additional personnel. Hall said these persons were directed to perform a "windshield" survey in order to determine whether or not the damage was of such severity and magnitude that it was beyond the capability of the local governments to recover in an effective period of time. Hall described a "windshield" survey as consisting of observations of debris while driving down the street. Schneider said that he conducted a "windshield" survey of Jackson County.

Hall testified that these "windshield" surveys revealed damage so severe the local governments could not handle it. He informed his national office of the results of these initial surveys who, in turn, notified the President of the United States.

While awaiting word form the President, Hall discussed the organizational structure with the state officials in Mississippi and potential sites for disaster application centers. Subsequently, the President declared Jackson County a major disaster area pursuant to the Disaster Relief Act of 1974, as amended, 42 U.S.C. §§ 5121, *et seq.* (the Act).

Pursuant to the Presidential declaration, FEMA and the State of Mississippi entered into a letter agreement (the Agreement) dated September 5, 1985, with respect to this disaster relief. (Exhibit P-10). The Agreement provided that FEMA was to pay 75 percent of the cost for the debris removal; the State of Mississippi was to contribute 12.5 percent; and the cities of Pascagoula and Ocean Springs (the Cities) were to pay the remaining 12.5 percent of the cost for their respective areas. (Exhibit P-10, para. 3). The Agreement declared that "[t]he Director of the Federal Emergency Management Agency (FEMA) or his Delegate shall make available such amounts of funds as he finds necessary for Federal disaster [sic] assistance within the limits of such funds available from" Congress and that "the maximum amount to be advanced on each project application will be determined by the FEMA Regional Director having responsibility for such actions." (Exhibit A, paras. 1 and 3). The Agreement further provided for both public and individual assistance programs for Jackson County. (*Id.* at para. 5). One of the types of public assistance programs was debris removal funding, which is authorized by § 403 of the Act (42 U.S.C. § 5173).

## III. *The Initial Meeting*

Hall explained that he served as both the federal coordinating officer (FCO) and the disaster recovery manager (DRM) for the Hurricane Elena disaster assistance. Hall

said that his primary duty was representing the President for the evaluation of disaster damages. Pursuant to that duty, he stated that his first task was to conduct a meeting with applicants and local governmental officials during which he explained the various programs along with their eligibility requirements. He also requested information on the categories and magnitude of storm damage to roads, parks, utilities, and buildings during this meeting. At the initial meeting in Jackson County, Hall and Schneider testified that Schneider instructed the local officials on their eligibility for debris removal and told them that they had the option of performing the debris removal themselves or of contracting for the work with private contractors. According to Hall, the state and local authorities were required to identify the types of damage by filing a "Notice of Interest" form.

## IV. *The Estimates*

Hall said that the next step in the disaster assistance process was for a survey team to estimate the quantity of debris and wreckage in Jackson County. These survey teams consisted of a federal, state, and local governmental representative. The federal representatives were primarily from FEMA although Hall testified that some employees from the United States Army Corps of Engineers were used.

Hall stated that it was Schneider's responsibility to brief the survey teams on the applicable laws and regulations. Schneider stated that he met individually with teams of six to ten engineers. Schneider also said that these engineers were experienced in the removal of debris and the estimation of quantities of debris. Schneider testified that they separated the county into its separate entities and he next directed the federal engineers to meet with the local and state representatives before conducting the inspection of the debris. Schneider stated that the state representatives were engineers and the local representative was either a county or a city engineer.

Hall said that the team members are required to execute damage survey reports

(DSR). Hall testified that the purpose of the DSR is to attempt to quantify the amount of the debris to facilitate the determination of the cost of removal of the debris. Schneider said that he then met with the survey teams and explained what they should look for and how to fill out the DSR forms. Schneider testified that he directed the teams to travel along every street to determine the quantity of debris located on the street at that time and how much debris would eventually be brought to the streets from the side yards, backyards, and alleys. Schneider said that he also told them to attach their sketches to the DSR, to show any projections they had and the basis for any projections. According to Schneider, he then discussed with the surveyors the estimating process in general and noted that the surveyors typically estimate in ten cubic yard increments. Schneider stated that it took the teams about a week to complete the survey of all of the communities in Jackson and Harrison Counties.

Taylor Morgan "Slim" Bondurant, a FEMA reservist (a part-time FEMA employee who is called into active duty during disasters), testified that he was a member of one the survey teams and he participated in the survey of areas in Jackson County, Harrison County, Moss Point, Pascagoula, and Gulfport with the primary location of his work being in Jackson County and Moss Point. Bondurant stated that he had 15 years of experience in the estimation of debris. He said that his team began the estimating process soon after the storm hit and they traveled through their designated areas counting the cubic yards of the debris along the roads, in yards, and behind houses. Bondurant further stated that they each prepared an estimate, averaging their estimates to derive their final figure for the DSR. Bondurant explained that no one on his team disagreed with the amounts on the DSR forms. After completing the DSRs, Bondurant said he passed them along to Schneider.

Bondurant testified that in preparing the DSRs, he would walk the ditches and drive the streets estimating the amount of the debris while estimating the cost of equip-

ment rental, labor, and materials. Bondurant stated that he also surveyed areas and estimated the amount of debris by viewing the debris in most cases or by actually measuring it in other cases. He said that after surveying half of their designated areas, the team members usually compared their totals by adding the amounts and dividing by three. Bondurant admitted that the local representative was occasionally too busy driving to make estimates so that they were left with his estimate and the state's estimate. He said that his estimate was always reasonable as compared to the other team members' estimates. Bondurant claimed that he instructed two to four people during the Elena estimates on how estimates are made.

Hall stated that the survey team members would have given the DSRs to Schneider and his staff who would have passed them onto Hall as part of the whole project application. Bondurant testified that he did in fact turn in his DSRs to Schneider's staff. Hall and Schneider also explained that the survey teams were required to conduct a more detailed inspection than his initial "windshield" surveys and that the DSR was ·a product of all three team members' estimates because a team member had a right to file a written notice of disagreement with the federal official's estimate. The FEMA handbooks also reflect that this objection process existed.

The agreement between FEMA, the State, and the Cities also stated, "Federal assistance will be made available in accordance with the Act, Executive Order 12148 and the implementing regulations found in Title 44 of the Code of Federal Regulations (CFR), as amended and currently applicable handbooks." (Exhibit A at p. 2). Hall testified that the handbooks referred to in this Agreement would have been non-mandatory, guidance documents developed as a result of the implementation of regulations and they would have delineated the eligibility requirements for public assistance, for applicants for public assistance, and for debris removal. After scrutinizing Exhibits P–3A (entitled "DR & R–2" and dated "July 1981"), P–3B (entitled "DR & R–1"

and dated "March 1981"), P–3C (entitled "DR & R 15" and dated "April 1985"), and P–3D (entitled "DR & R 7" and dated "August 1981"), Hall admitted that these were the types of handbooks alluded to in the Agreement.

Several handbooks contained references to the DSRs. Handbook DR & R 1 provided:

> b. By signing item 16 of Damage Survey Report (DSR) the representative of the Federal agency performing the review indicates that from a professional engineering or construction point of view, the contents of the Damage Survey Report provide accurate and reasonable basis for FEMA to make a determination of eligibility of work and of project costs. The reviewer should annotate the Damage Survey Report or add attachments to it if necessary to make any corrections or comments deemed necessary. By signing item 16 of DSR, the FEMA representative indicates that he/she has reviewed the DSR and from an overall program point of view and is satisfied that it is detailed, complete and reasonable as the basis for preparation of a project application. The DSR, when reviewed, is a recommendation and is not approved for FEMA funding until included in a project application that is approved by the Governor's Authorized Representative and by the Regional Director, or their duly authorized designees.

(Exhibit P–3B at p. "3–2"). Handbook DR & R 1 also stated:

> b. *Damage Survey Reports.* The importance of complete and accurate DSR's should be emphasized. Federal inspectors will follow normal procedures in preparing DSR's for each applicant.

(*Id.* at pp. "0–3"—"0–4").

Handbook DR & R–2 provided a detailed analysis of the DSR. That Handbook stated:

> 3–3. *Inspection Teams.*
>
> a. Damage surveys are usually conducted by a Federal–State inspection team. An authorized local representative ac-

companies the Federal/State inspection team and is responsible for representing the applicant and assuring that all damage and needs for assistance are inspected. The inspectors record pertinent information on a Damage Survey Report, including a description of the damage, proposed repairs or replacement, and the inspectors' best estimate of the cost of the recommended work.

\*　　\*　　\*　　\*　　\*　　\*

c. Inspectors operating in the field as members of Damage Survey Teams are under the supervision by the field supervisors, who coordinate with the Regional Director or his representative. Damage surveys are expected to be accomplished by Federal inspectors jointly with State inspectors and local representatives.

3-4. *Responsibilities of Federal Inspectors.* Each inspector should:

a. Know the rules of eligibility for disaster assistance work as outlined in this handbook. When in doubt on questions of eligibility, the Inspector should consult with his supervisor, and not those of the Inspector's Federal agency.

b. Know how to complete the DSR and other related forms.

c. Know the current methods of cost estimation and prevailing unit prices for labor, equipment, and materials used in the affected area and have appropriate references available for use in preparing DSRs.

\*　　\*　　\*　　\*　　\*　　\*

g. Report to the FEMA Disaster Field Office as requested;

h. Attend FEMA briefing for inspectors;

i. Arrange and follow schedule for visiting involved applicants in coordination with FEMA and the Governor's Authorized Representative;

j. Visit each site of damaged facilities and review applicable records, to determine and document the extent of damage, the scope of eligible work, and the estimated cost of such work.

\*　　\*　　\*　　\*　　\*　　\*

k. When restoration of a facility damaged by a major disaster involves significant upgrading based on codes and standards, current at the time of occurrence of the major disaster, obtain a copy of the applicable standards to be submitted with the DSR, and verify consistent application of such standards by the applicant prior to the major disaster.

3-5. *Preparation of Damage Survey Reports.* Each Federal/State inspection team should:

a. Identify the damaged facility and describe the extent of damage in terms of its existing structural components.

b. Specifically define the scope of eligible work and clearly indicate the reasonable costs of eligible work. Know the difference between force account work and contract work and the manner in which to estimate for each; clearly specify the basis upon which the estimate was prepared.

c. For eligible emergency work, consider the various methods of performing such work and select the one which attains an optimum mix of speed, economy, utility, and safety. If the work is in process or has been completed by the applicant, evaluate his/her method for suitability to the circumstances.

\*　　\*　　\*　　\*　　\*　　\*

e. Record the scope of eligible work specifically and clearly, using pictures and/or sketches. Provide quantitative measures of the work to be performed and break down cost estimates to show pertinent details such as labor or equipment rates, or hours of work, quantities of materials and components, etc. Consider whether or not sufficient information has been recorded to permit others to review the DSR and obtain a clear picture of what work is considered to be eligible under PL 93-288.

\*　　\*　　\*　　\*　　\*　　\*

3-6. *Submissions and Resurveys.* The Federal agency in charge of each team of Federal and State Inspectors will review and submit completed DSRs to the RD or his representative. A FEMA official will review each DSR for completeness, accu-

racy, and general eligibility, and then initial the report. The RD will return reports which he finds to be unacceptable to the appropriate Federal agency for the inspecting team for additional information or resurvey. Such resurvey or revision must be made and resubmitted as soon as possible. In cases where the State or local Inspectors do not concur with the findings of the Federal Inspector, they should submit their comments on an attachment to the Damage Survey Report.

3–7. *Importance of Damage Survey Reports.*

a. *General.* Federal, State and local Inspectors should make every effort to provide clear and concise Federal Damage Survey Reports (DSR). These reports form the basis for the determination by the Regional Director of eligible work by approval or denial of specific line items in a project application (Appendix K). It should be emphasized that these DSRs do not constitute any approval of work or commitment of Federal funds. Federal Inspectors shall inform applicants that written approval of a project application is required to determine the scope of eligible work and to obligate Federal funds. The DSR should be complete and should provide a specific statement of the extent of damages, a complete description of the damaged facility, a statement of the scope of eligible work, and a detailed estimate of the reasonable cost of eligible work. Since flexible funding under Section 402(f) or any small project grant under Section 419 of the Act will be based on Government estimates, the reliability and validity of the DSR is of major importance (See Appendix D). The damage survey reports for emergency work must be expedited to enable the Regional Director to approve such work as soon as possible. DSRs for permanent work may be completed concurrently with those for emergency work, or when authorized by FEMA, the DSR for permanent work may be given lower priority than for emergency work. For some damaged permanent facilities, extensive engineer-ing, and administrative work may be required to complete the DSR properly.

b. *Responsibility.* In preparing a DSR, the Federal Inspector must recognize that his recommendation is his best estimate of work for which the Federal Government can provide reimbursement under the Act. His responsibilities for effective response to FEMA in this work are just as great as his responsibilities to his own agency under any other program. Maximum use of photographs, maps, drawings, etc., should be included as part of the report to provide complete documentation and description. The DSR is considered to be a professional engineering report and recommendation, and should be representative of acceptable engineering practices and agency expertise.

(Exhibit P–3A at pp. "3–1"—"3–5"). Handbook DR & R2 also provided a DSR form which notes that "[c]ost estimates must be realistic." (*Id.* at p. "D–2").

Handbook DR & R 15 contained guidelines for the removal of debris. This Handbook also referred to estimates of debris and provided:

b. *Development of the Project Estimate.*

Procedures for developing the project estimate can be subdivided into two steps. First, preparation of a qualitative and quantitative estimate for contracting purposes and second, preparation of the government cost estimate for management purposes.

Let's begin with the quantitative and qualitative estimate of debris to be moved. . This estimate is extremely important in order to clearly identify to contractors the scope of work which they are being asked to perform. This estimate will also be of assistance in preparation of project cost data.

&ast; &ast; &ast; &ast; &ast; &ast;

The volume of debris can be approximated by an estimate of length, width, and depth of the material in question. The amount of material to be removed and the accuracy desired in the estimate will

determine the procedures used for this volume measurement. On a large scale disaster, an approximate quantity estimate may be derived by marking the area on a scaled map and approximating an average depth. When developing quantity estimates inspectors should be instructed to note the type and location of the debris.

After the quantity, location and nature of the debris within the project area has been established the next step is to develop unit cost data. Several sources exist which may assist in determining the proper unit price to be used once the project scope has been defined, the type contract selected, and the units established.

\* \* \* \* \* \*

The development of a unit price includes many variables. Factors that influence the unit cost are: (1) types of debris, (2) method of removal, (3) distance to the disposal site, (4) routes to the disposal site, (5) permitting requirements, and (6) work site limitations. In their cost estimate, inspectors should address all items to be included in the scope of work. These items will include the actual work which may be required to accomplish the specific tasks. For example: If a damaged building is to be demolished and that building is located next to a main waterline serving the city, an indirect cost of the project would be protection of the line while the building is being demolished.

The individual performing the cost estimate must put himself in the place of the contractor who is being asked to submit a price for the work. This is very important in a disaster situation where there may be a large variety of factors which will affect the contractor's pricing. (Exhibit P–3C at pp. "4–4"–"4–6"). The "Foreword" to this handbook stated that it was "designed to provide guidance to community leaders in mobilizing, organizing, and controlling a large scale debris removal operation" and that FEMA "developed this guide to managing debris removal operations as a public service." (*Id.* at unmarked p. 4).

Hall examined Exhibits P–8, P–9, and P–10 and admitted that they were compilations of the DSR's. Exhibit P–8 is entitled "Preliminary Estimate"—"Quantities of Hurricane Elena Debris and Wreckage" and provided in pertinent part:

> The quantities of Hurricane Elena debris and wreckage set forth in the Debris Removal Sites listed below are preliminary estimates derived by damage survey teams and should be considered accurate only for preliminary debris removal planning purposes. The federal, state and local governments make no representation as to the accuracy of these estimates. Each contractor submitting a bid for debris removal shall make his own estimate of the quantity of debris to be removed and the cost of removal.

ESTIMATED QUANTITIES—CUBIC YARDS

| Pascagoula Sites: | |
|---|---|
| P1 | 32,360 |
| P2 | 14,980 |
| P3 | |
| P4 | 8,020 |
| P5 | 5,230 |
| P6 | |
| | |
| Ocean Springs Sites: | |
| OS1 | 16,000 |
| OS2 | 32,000 |
| OS3 | 24,000 |
| Total | 72,000 |

Quantities will be added as they become available. The latest estimates are available from the Jackson County Planning Commission.

(Exhibit P–8). Exhibit P–9 contains the identical language that is contained within Exhibit P–8 but some of the figures were filled in. The pertinent alterations to the Pascagoula sites included: "P3 — 13,440"; "P6 — 13,330"; and the total, "87,360." (Exhibit P–9). Like Exhibit P–9, Exhibit P–10 contains the same language as Exhibit P–8 but Exhibit P–10 has updated amounts for some areas in Pascagoula: "P3 — 43,000," "P4 — 16,000", and the total, "124,900." (Exhibit P–10).

Wayne Fletcher, Johnny Smith, and Boyce Childs testified that Exhibits P–8 and P–9 were passed out by local authorities. They remembered receiving P–8 with the initial bid package and P–9 prior to the second bid opening. According to Smith and Fletcher, they received a copy of P–10 a few days after the second bid opening. Childs concurred that he did not receive P–10 until after the second bid was accepted. Smith insisted that he relied upon Exhibit P–9 in formulating his bid despite the warnings because he understood from the meetings and newspaper articles that FEMA officials would not pay more than $4.00 per cubic yard times their estimates.

Jim Williams, Administrator for Jackson County, stated that all of the estimates, Exhibits P–8, P–9, and P–10, were made available to the contractors before the opening of the second round of bids. Lewis Guirola, Attorney for Jackson County, agreed that Exhibits P–8 and P–9 were available prior to the opening of the second bids but was not sure about P–10. Roger Clark of the Jackson County Planning Commission stated that all of the estimates, P–8, P–9, and P–10, were available in his office. Guirola also testified that he and his engineers considered the estimates in P–8, P–9, and P–10 to be unreliable.

Oscar Jordan testified that he has been the city attorney for Ocean Springs since 1981. He further stated that he was not involved in the preparation of estimates and that Gene Copeland handled that responsibility for Ocean Springs. At trial, no party was able to locate Copeland. Charles Fulghum, city manager for Pascagoula from 1977–1986, admitted that the City relied heavily upon the FEMA personnel for the debris estimates. Fulghum also stated that he was never concerned about accuracy of the debris estimates because the contractors were told throughout the bidding process that they should be responsible for their own estimates and they should not rely on the FEMA estimates. He explained that the County Planning Commission was compiling the estimates and making them available. John Engel, Public Works Director for Pascagoula, testified that the contractors were never told to rely on the FEMA estimates.

Schneider admitted that P–8, P–9, and P–10 were a collection of the amounts from the DSRs for those areas. Both Schneider and Hall insisted that these "Preliminary Estimates" were not assembled by FEMA personnel. Schneider and Hall also said neither they or any FEMA personnel distributed the estimates. Hall said that he would have advised the local officials that they should not pass out copies of the estimates but that there was no prohibition on their publication. Hall also admitted that Schneider may have informed him of the publication of the estimates after they were released. Hall and Schneider stated that their only concern was that the estimates should be made available to all of the contractors so no one contractor received an advantage in making his bid. Melvin Mitchell, Pascagoula city attorney, said he was not concerned about the release of the estimates because they contained warnings. Schneider explained the local officials thought the estimates should be published to permit smaller contractors to bid on individual areas. Hall admitted that he did nothing to assure that all contractors received all of the estimates.

Engel stated that he drove down most of the streets in his City and discovered that the debris in Areas 3 and 4 of Pascagoula was underestimated. He recommended that these two areas be re-surveyed. Exhibits P–7 and P–10 reflect that the debris for Areas 3 and 4 in Pascagoula were in-

creased from 13,440 cubic yards to 43,000 cubic yards (for Area "P3") and increased from 8,020 to 16,000 cubic yards (for Area "P4"). Engel testified that these were the only two areas in which the FEMA estimates were unsatisfactory.

Schneider verified that he was informed of Engel's complaints about the estimates on Areas 3 and 4 around September 12 or 13, 1985. Schneider said that the results from the resurvey did not cause him to question the amounts for the other areas because Engel felt the other estimates were reasonable. Bondurant stated that he performed a re-survey in Biloxi and one in Pascagoula.

Jordan testified that Copeland participated in a second drive around Ocean Springs to check the estimates of debris yardage. Fulghum recalled that Engel requested that two areas in Pascagoula be re-surveyed because Engel felt the estimates inadequately reflected the amount of debris in those two areas.

### V. *The Preparation of the Contract*

Melvin Mitchell testified that he, the local officials, local engineers, and the entities' attorneys assembled on the Saturday after Hurricane Elena to draft the contracts. Melvin Mitchell declared that no FEMA personnel attended this meeting. Lewis Guirola was the Jackson County Board of Supervisors' Attorney in 1985 and he stated that this meeting occurred at the Emergency Operations Center in Jackson County. He and Melvin Mitchell testified that they formulated the contract which provided for the debris removal. Guirola said that there was a unified effort because they all wanted to get the lowest bids and because there was no use in developing separate contracts for each entity. Guirola and Melvin Mitchell testified that their engineers' specifications were considered but that the contract was drafted from "scratch," mainly using contracts previously drafted by Melvin Mitchell as models. They admitted that they ignored the model contract contained in the handbook.

Guirola and Melvin Mitchell also testified that they decided to use a lump-sum con-

tract because of problems that developed during the removal of debris following Hurricane Frederick in 1979. They said that during the Frederick cleanup, the local officials had discovered that a unit price contract (*i.e.*, contractor paid by amount of debris removed) was impossible to monitor and that there was a substantial amount of abuse and fraud. Melvin Mitchell and Guirola stated that they designed the contract so that the local officials would not have to be concerned with monitoring the removal of debris. Guirola said that, then, he and Melvin Mitchell drafted the contract but never submitted it to FEMA for their review and he did not think FEMA reviewed the contract. After examining the contracts between the plaintiff and the Cities, Guirola stated that there was not substantive difference between the Pascagoula contract (Exhibit P–18) and the Ocean Springs contract (Exhibit P–19).

According to Schneider, he conducted an initial meeting with local officials in Jackson County in order to discuss FEMA, the debris removal process, and the different types of contracts which the local officials could use to contract for the removal of debris. Handbook DR & R 15 provided:

> A lump sum contract is suited for all work within prescribed boundaries or for building demolition contracts where the scope of work may be clearly defined.
>
> \* \* \* \* \* \*
>
> As mentioned before the Lump Sum Contract should be used only when the scope of work is clearly defined and the areas of work can be specifically quantified.

(Exhibit P–3c at pp. "4–7"–"4–9"). This handbook also contained a model lump-sum contract as Appendix F. Schneider explained that the handbook simply contained non-mandatory guidelines and a general form contract which the local officials could use as a guide. He insisted that the officials had already decided to use a lump-sum contract and that he did not actually see the contract until he was travelling to the first pre-bid conference. Hall admitted that Handbook DR & R 15 (Exhibit P–3c) did indicate that lump-sum contracts should only be used where there is a clear scope of

work but he insisted the scope of work in the removal of debris after Elena was clear. Hall and Schneider said that the local officials had been given a copy of the handbook on debris removal.

After reviewing Exhibit P–3c entitled "DR & R 15," Hall admitted that this was the handbook which contained the guidelines for local officials for the removal of debris. Hall admitted that he did not review the local contracts to determine whether or not they complied with the handbook but he was sure that Schneider did. Hall insisted that he knows of no regulation or other prohibition on the use of lump-sum contracts for the removal of debris.

Schneider noted that the local officials had voiced concerns about the problems they had with the debris removal contracts after Hurricane Frederick. He said that because the local officials had administered unit price contracts, he had to explain very little about them but they did discuss the difficulties with monitoring such contracts. Hall noted that the Jackson County officials had decided from the outset to use a lump-sum contract for the removal of the debris due to problems that had arisen during the Hurricane Frederick cleanup (*i.e.,* monitoring of the yardage under the unit price contract). Schneider indicated that his only involvement with the preparation of the contract was to explain to Melvin Mitchell the FEMA requirement that local contractors be given preference over nonresident contractors. According to Hall, the local officials developed the contracts that they used and he had not been consulted by them. Hall knew that the local officials in Jackson County had had problems administering the unit price contract after Hurricane Frederick.

Jordan testified that his first involvement with the debris removal efforts of Ocean Springs after Hurricane Elena occurred when city officials contacted him to inform him that there would be a concentrated effort to draft a lump-sum contract. Jordan stated that these officials directed him to attend a meeting at the Jackson County Planning Commission on the Satur-

day following the hurricane. He indicated that at this time, his information was primarily coming from Mayor Chester McPhearson. He insisted that he was not involved in a discussion as to what type of the contract they were going to use. He stated that when he became involved in reviewing the proposed contract, there was a clear understanding that a lump-sum contract would be used by the county and all cities located therein. Jordan also admitted that he did not have Handbook DR & R 1 or Handbook DR & R 15 or use them when he prepared the Ocean Springs contract (Exhibit P–19). According to Jordan, Guirola and Melvin Mitchell had performed preliminary work on the contract when he became involved with its preparation. Jordan admitted that he simply reviewed the document already drafted and the final version may have included some of his input. He denied knowing the extent of FEMA's involvement in the contract preparation. After examining Exhibit P–19, he admitted that it was the Ocean Springs debris removal contract. Jordan also stated that he thought the contract required the contractor to remove all debris within the city which was on the right-of-way or adjacent thereto. Charles Fulghum explained that he was responsible for all of the City's administration—*i.e.,* hiring, firing, and personnel management. He also indicated that he attended the initial meeting with FEMA personnel after Hurricane Elena. He said that Roger Clark, Jackson County Planning Commission Director, or Jim Williams, Jackson County Administrator, would have conducted this meeting. According to Fulghum, they discussed the option of using a lump-sum contract or unit price contract. He insisted the everyone at this meeting had a general tendency towards the lump-sum contract. He denied that a decision was reached on their choice of contracts at this meeting but admitted that it was a general understanding. Fulghum stated that FEMA officials encouraged the use of lump-sum contract. He testified that everyone recalled the difficulties with the paperwork and monitoring of the unit price contract after Hurricane Frederick. He said that he had decided

that the lump-sum contract would be the better option. Fulghum admitted that at the first meeting, no one knew how much debris would need to be removed. He stated that the attorneys had a handbook to use as a guideline to assure they stayed within the regulations and that he had reviewed the handbook. Fulghum also noted that FEMA reviewed the proposed contract but did not make any changes.

## VI. *The First Bids*

Fridge Construction Company, Inc., and Johnny Smith Truck and Dragline Service, Inc., became a joint venture to allow Smith to take advantage of a federal practice which directs local officials to award bids to local bidders whenever their bids are within ten percent of a lower bid of a nonresident. Wayne Fletcher testified that he had worked for Johnny Smith Trucking for 15 years and his position in 1985 was comptroller and corporate secretary. He said that he had previously assisted Smith in preparing a bid for the removal of debris in Houston after a hurricane had struck that area. Johnny Smith testified that his company does general contracting work including site preparation, levee building, site cleaning, and hauling of debris. He said his past experience involving the removal of debris included Hurricane Camille in 1969, Hurricane Alecia in Houston in 1983, Indiana tornadoes, Corpus Christi hurricane, and the Pearl River County, Mississippi tornadoes in 1970.

Fletcher said that after Elena struck the Mississippi coast, he and Smith decided to have employees with previous debris removal experience (including Boyce Childs) assist them in estimating the quantity of debris and calculating their bids. Fletcher insisted that the estimating process began immediately after they received the bid package on September 6, 1985, and continued for four days. Fletcher admitted that he had seen Exhibit P–8 before he and Smith calculated the first bid but they did not rely upon this estimate. He said that they used a figure of approximately $4.00 per yard multiplied by their estimates. Fletcher explained that their cost for the Elena bids was higher than the Houston

bids because they had to supply their own dump site and the cost for Pascagoula was higher because the debris was more difficult to remove there. He admitted that he and Childs recommended a unit price but that it was Smith's final decision. Fletcher pointed out that each contractor was required to bid on the 21 areas individually.

Boyce Childs testified that he had worked in the debris removal efforts after Hurricane Frederick in Mississippi in 1979 and after Hurricane Alecia in Houston in 1983. Childs stated that he assisted the plaintiff in its calculation of the bids for both Houston and Elena. Childs stated that he obtained the bid package for the Elena cleanup for the Jackson County Planning Commission office and it contained maps of the divided areas.

Childs, Fletcher, and Smith testified that they calculated their bid on each area individually and that it was $3.50 per cubic yard for Ocean Springs and $4.00 per cubic yard for Pascagoula. According to Smith, in preparing his bid, a contractor should consider the amount of debris, his bonding capacity, his dump site's availability and cost, and his transportation time and costs. Smith admitted that as compared to the FEMA and local officials, he was more knowledgeable on all of those factors except the amount of debris. Fletcher and Smith testified that they submitted their bids for all of the areas in Jackson County, Ocean Springs and Pascagoula. They said they had estimated approximately 127,000 cubic yards of debris in Ocean Springs and 250,000 cubic yards for Pascagoula when they proposed their first bid.

Fletcher testified that the bids were read aloud on the morning of September 10, 1985. According to Fletcher, city, county, and FEMA officials conducted a meeting that afternoon. Fletcher said that Melvin Mitchell, Guirola, and Schneider definitely attended this meeting. Fletcher insisted that Schneider explained that all of the bids were rejected because they were too high. He then stated that Schneider told the contractors that the contractors were not experts (they did not know what they were doing) and he instructed the contractors to

use the published estimates (Exhibits P–8 and P–9). When cross-examined, Fletcher admitted that he had previously stated in an affidavit that Guirola had made the statements concerning FEMA's expertise on estimates of debris.

Childs stated that he had attended the meeting where their first bids were rejected and that Melvin Mitchell, Guirola, Fulghum, Copeland, and FEMA officials also attended it. He then said that either Guirola or Melvin Mitchell announced that the bids were too high and that the FEMA personnel were experts so their estimates should be relied upon. Smith testified that the bids were first read aloud and then later rejected as being too high. He admitted that Guirola ran the meeting but he stated that Schneider also spoke at this meeting. According to Smith, all of the officials, including Guirola and Schneider informed the contractors that they did not know what they were doing and that FEMA estimates should be used because FEMA's personnel are experts. David Mitchell, an employee of Smith, testified that the bids were opened and read aloud in the morning and that the bids were rejected that afternoon. He also testified that the officials informed the contractors the bids were outrageously high and they would continue to reject the bids until the bids were more in line with the FEMA estimates.

Jim Williams testified that he attended the meeting at which the first bids were rejected and that no one represented the accuracy of the estimates to the contractors. Guirola admitted that he was the spokesman at all of the meetings with the contractors. He said he conducted the bid opening meeting from the stage of the auditorium of the Community College in Gautier, Mississippi and on September 10, 1985, he stated that he read the bids aloud and told the contractors they would take the bids under advisement.

Everyone, including Guirola, admitted that Exhibit P–11 was a compilation of all of the bids on each of the areas in Jackson County and all legal entities located therein. According to Guirola, that night, he,

Melvin Mitchell, and the city administrator met to discuss their options. Guirola said that all of the local officials considered the bids high. He admitted that the primary factor in their evaluation of the bids was the amount of estimated cubic yards for each area (as estimated on Exhibit P–8 and P–9) multiplied by the $4.00 per cubic yard figure. Guirola also admitted that even though the contractors' estimates were more reliable than the FEMA estimates, they did not use the contractors estimates to evaluate the bids. He stated that they would have accepted a bid if it had been within the figure arrived at by multiplying $4.00 per cubic yard by the FEMA estimates. Guirola then said that, after discussing their options, the local officials agreed to reject all of the bids and accept bids based on whole cities and the eastern and western parts of Jackson County. At this time, Guirola said Moss Point decided to use its own personnel to remove debris. Guirola does not remember any FEMA officials attending this meeting.

Hall testified that he did not attend the meeting at which the first round of bids were rejected. He also admitted that it would not have been unusual for someone to inform the contractors the reason for the rejections or to schedule a second round of bids three days later. Hall explained that due to the emergency situation (some streets were blocked by debris), they would have attempted to get a contract and remove the debris as fast as possible. He also insisted that he never informed the local officials the reimbursement amount was limited to $4.00 per cubic yard multiplied by the FEMA estimates. Hall said that after the bids were rejected, he met with them because they were considering a request of military assistance. He stated that at this meeting, he informed them of the prerequisites for military intervention and informed them that the $4.00 per cubic yard was not a limit. He insisted that several variables would have been considered in determining what exactly was a reasonable cost and that it would have been in the $2.50 to $6.00 range. Hall testified that Schneider informed him the first bids were rejected because they were

too high but he did not remember the basis for that conclusion.

Schneider testified that he was present when the first bids were read aloud. He said a few minutes later, he attended a meeting involving the local officials in the stairwell. Schneider stated everyone agreed that the bids were unreasonably high. He claimed that no one said the contractors did not know what they were doing or that the FEMA estimates should be relied upon. He denied ever telling the officials that FEMA would not pay more than $4.00 per cubic yard. Schneider further stated that he never told the officials that FEMA would not reimburse the local officials if they accepted the first bids since no one asked him to accept them. He also insisted that FEMA had paid more than $4.00 per cubic yard in the past and that he explained to some officials from Moss Point that FEMA would consider any amount within 30 percent of $4.00 per cubic yard to be reasonable. Schneider also asserted that the local officials felt the bids were unreasonable and that he did not give them advice. He also denied knowing that the estimates were inaccurate and since Moss Point had no problem removing their debris, he believed the estimates were accurate. Roger Clark agreed that Guirola conducted the meetings. He also insisted that no one directed the contractors to disregard their own estimates and use the FEMA estimates to calculate their bids. Clark further stated that the FEMA officials did not limit their reimbursement to $4.00 per cubic yard multiplied by the FEMA estimates. He testified that the FEMA yardage estimates were not necessarily used in rejecting the bids. Melvin Mitchell testified that no one ever stated the FEMA officials should be relied upon. He said the bids were rejected simply because they were too high but that no FEMA official ever told them that FEMA would not pay more than $4.00 per yard. "Circular A–102 (Rev.)" was entitled "Uniform Requirements For Assistance To State and Local Governments" and provided:

> Procurement under grants shall be made by one of the following methods, as described herein: (a) small purchase procedures; (b) competitive sealed bids (formal advertising); (c) competitive negotiation; (d) noncompetitive negotiation.

> \* \* \* \* \* \*

> b. In competitive sealed bids (formal advertising), sealed bids are publicly solicited and a firm-fixed-price contract (lump sum or unit price) is awarded to the responsible bidder whose invitation of bids, is lowest in price.

> \* \* \* \* \* \*

> (2) If formal advertising is used for a procurement under a grant the following requirements shall apply:

> \* \* \* \* \* \*

> (e) Any or all bids may be rejected when there are sound documented business reasons in the best interest of the program.

(Exhibit P–3e at pp. "0–7"–"0–8"). Hall testified that the sound documented business decision for rejecting the first bids was that they were unreasonably high.

Jordan testified that he did not attend the first bid opening or rejection and that he did not participate in the evaluation of the bids. He stated that he had heard that the bids were too high. Jordan also indicated that he did remember FEMA officials insisting on a bid at $4.00 per cubic yard. Fulghum stated that he did attend the bid opening at the Jackson County Junior College and that Melvin Mitchell, Clark, Williams, Schneider, and other officials were present. He also testified that he did not remember anyone stating that FEMA would not pay more than $4.00 per cubic yard. Fulghum said the bids were read aloud and someone else wrote them down. According to Fulghum, they told the group they would be informed later if the bids were accepted. He said afterwards all of the local officials discussed the bids and agreed that they were unreasonably high— that is, much higher than he and Melvin Mitchell had anticipated. He admitted that they thought bids should have been around $4.00 per yard but that the FEMA officials did not limit their payment to $4.00 per yard. Fulghum stated that Schneider

strongly recommended that the officials not accept the first bids. Fulghum also explained that they knew the bids were much higher than $4.00 per yard because they divided the bids by the FEMA–State–local survey team estimates. He said that he then met with the Pascagoula City Counsel who rejected the bids and that Melvin Mitchell probably informed the contractors.

## VII. The Second Bids, Contract Award, and Execution

On September 12, 1985, the second pre-bid conference was conducted. Guirola said they announced that bids based on entire cities and on east or west county zones would be considered. He also stated that they were questioned again about the FEMA estimates (on the amount of debris) and Guirola informed them that the FEMA estimates were unreliable and should not be used in calculating their bids. He further insisted that FEMA personnel did not participate in the discussion and were not on stage at the second pre-bid conference.

Smith and Fletcher testified that because the officials said the contractor estimates were inaccurate and because they had to submit their bids within a couple of days, they based their second round of bids upon the FEMA estimates (Exhibits P–8 and P–9). Fletcher, Smith, and Childs testified that their second bids were calculated by multiplying their costs per cubic yard times the FEMA estimates. Exhibit P–15 was a compilation of the second round of bids. It revealed that the plaintiff's bid was $341,404.80 for Pascagoula and $246,400 for Ocean Springs. The yardage figures on Exhibit P–11 mirror the yardage totals for each of the areas on Exhibit P–10. However, the plaintiff did not submit the lowest bids for the areas in the non-incorporated areas of Jackson County. The plaintiff's lower bids in the second round of bidding were approximately 70% lower for Pascagoula and 50% lower for Ocean Springs.

Fletcher stated that they did not have Exhibit P–10 when they prepared their second bid and that they would have used it to calculate the second bid. Exhibit P–10 indicated that there was 50% more debris in Pascagoula than Exhibit P–9 did. Fletcher and Childs admitted that they advised Smith of rumors of a change in the estimates after they had submitted their second bid but before it had been accepted. Childs testified that after their first bids were rejected, he re-examined some of the areas in Pascagoula but that they ended up calculating their bid by multiplying $3.90 per yard for Pascagoula and $3.42 per yard for Ocean Springs by the FEMA estimates on Exhibits P–8 and P–9. Childs did not remember checking with the Planning Office to see if there were new estimates before they submitted the second bids. Exhibit P–15 indicated that the next closest bid to the plaintiff's bid in the second round was $77,000 higher for Pascagoula and $31,000 higher for Ocean Springs.

Jordan stated that he attended the opening of the second round of bids. He remembered that the plaintiff was the low bidder for both Ocean Springs and Pascagoula. Fulghum said the second group of bids were read aloud and someone compiled them. He stated that the plaintiff was the low bidder for Pascagoula and Ocean Springs. Fulghum said that the next step was for them to present the bid to the City Counsel who then approved the bid.

Smith and Fletcher testified that they attended another meeting wherein the bids were read aloud. According to them, a short while later their bids were accepted for Ocean Springs and Pascagoula. Fletcher stated that a meeting was held later that day in which the contracts were to be executed. Fletcher, Childs, and Smith testified that they mentioned the rumors of new estimates, but Melvin Mitchell said they should not worry because the city would "work with" the plaintiff in order to get the work done. Melvin Mitchell admitted that he could have said they would work with the plaintiff but that he simply meant the city would cooperate with the plaintiff's performance. He also said that he did not remember whether or not the contractor questioned him about the estimates but he does remember that everyone was happy.

When cross-examined, Fletcher admitted that he had some experience in working under a lump-sum contract, that plaintiff had performed larger contracts, and that there was no reason for the Cities to have been concerned that the plaintiff could not perform the contract. Smith testified that he has 25 years of contracting experience and that he has dealt with subcontractors and contracts before. He also admitted that he understood the differences between a lump-sum contract and a unit price contract. He explained that the owner usually has a representative verify the amounts hauled under a unit price contract. James Adams, a contractor who bid on the Elena debris removal contracts, testified that he never relied upon the FEMA estimates because when he bids a job, he bases the bid upon his own estimates. Adams said his second bid was lower than his first bid because he found that there were some private individuals and organizations removing debris. The second bid opening was held three days after the first bid opening. Fulghum said that there was a great deal of pressure on the Cities to get the debris removed because there were large amounts of debris blocking parts of some streets and the debris was becoming a fire hazard.

## VIII. *Problems During the Performance of the Contract*

Fletcher, Smith, and Childs testified that they experienced several problems during the performances of the debris removal contracts.

### A. Excessive Debris

Childs testified that it was his responsibility to manage the debris removal efforts in Pascagoula and Ocean Springs. He said that he had hired several subcontractors to remove the debris. Childs stated that he initially paid these subcontractors for the streets they had cleared based upon the amount of debris FEMA had estimated for those streets. He claimed that these people began quitting because they were having to remove far more debris than was estimated. Childs stated that they eventually began to pay workers an amount per

cubic yard of debris that they actually removed, regardless of the FEMA estimates. He also admitted that he requested assistance from Smith and Fletcher because there was so much debris and he was making little progress. Fletcher verified Childs' description of the problems with the crews. Fletcher and Smith stated that because of Childs' slow progress, they brought all of their equipment to Ocean Springs to assist in the debris removal efforts.

Fletcher said that he maintained the records of the quantities of debris actually removed from Ocean Springs and Pascagoula. After examining Exhibits P–32, P–33, and P–34, Fletcher and Smith testified that these were the quantities of debris actually removed from Ocean Springs and Pascagoula. These Exhibits revealed that 189,650 cubic yards were removed from Pascagoula and 127,816 cubic yards were removed from Ocean Springs. All three of the preliminary estimates (P–8, P–9, and P–10) indicated that 72,000 cubic yards were estimated for Ocean Springs. Exhibits P–9 revealed that 87,360 cubic yards were estimated for Pascagoula and Exhibit P–10 indicated that there was 124,900 cubic yards of debris in Pascagoula. Childs, Smith and Fletcher, all testified that they used trucks with excessively high side rails and packed the trucks tightly so that approximately 50%–70% more debris was moved than the actual figures indicated. They also said that these excessive amounts of debris (*i.e.*, more than they anticipated since they had reviewed the estimates located on Exhibit P–9) contributed to the delay in their removal of the debris beyond the 30–day period.

David Mitchell testified that he estimated some of the areas for the plaintiff and that there was far more debris on the streets than the estimates indicated. According to David Mitchell, he and a co-worker surveyed area 4 in Pascagoula. He said that he estimated 21,000 cubic yards of debris and his co-worker estimated 18,500 cubic yards while the estimates indicated there were only 8,020 cubic yards. David Mitchell felt that this was not a reasonable devia-

tion. Jim Williams also testified that these estimates were too low and did not account for the debris located in the backyards. Guirola likewise stated that the estimates were considered low and unreliable by him and the county's engineers.

Hall recalled the meeting that he had with Smith after the debris removal was underway where Smith voiced his complaints of excessive debris. Schneider testified that he did not know the plaintiff was complaining of excessive debris until the plaintiff's attorney sent a letter to FEMA in October 1985. Schneider testified that the complaints of the contractor did not make him question the accuracy of the estimates because the plaintiff's calculations were not verified by independent officials. He noted that in a lump-sum contract, the local officials do not have a reason to check the amount of debris being removed. Bondurant and Engel stated except for the areas that Engel requested be re-surveyed, they had no complaints about the estimates being too low and they felt that the estimates were reasonable. James Adams testified that when he conducted his estimates, he determined that there was more debris than the published estimates indicated.

### B. Non-Hurricane Debris

Fletcher, Childs, and Smith stated that 20% of the debris that was removed from Pascagoula and 30% of the debris removed from Ocean Springs was non-hurricane debris. Exhibits P–23 and P–24 were introduced which verify that the plaintiff claimed those amounts of non-hurricane debris in October 1985.

Fletcher stated that as soon as they started seeing non-hurricane debris, he and Childs met with city officials (including Melvin Mitchell) and FEMA officials to inform them of the problem. After examining the contracts, Fletcher said that he considered "hurricane debris" to be limited to items actually damaged by the hurricane. According to Fletcher, there were old refrigerators, old furniture, and recently-cut trees in the piles by the roads. Fletcher said they responded to his verbal complaints by telling him to pick up everything on the street. Childs testified that as soon as they started removing debris, they discovered non-hurricane debris—*e.g.*, paint cans, toilets, live pecan trees—which were cleared from an orchard, and tractor tires from a store which had been destroyed by fire before Hurricane Elena. Childs insisted that he voiced his complaints to Bondurant and Melvin Mitchell as representatives for FEMA and the City, respectively.

Smith reviewed the contracts (Exhibits P–18 and P–19) and testified that he thought hurricane debris had to be storm caused or related. Smith said that he witnessed the clearing of four lots of trees within a subdivision which were placed by the street. He also insisted that he showed this problem to city and FEMA officials. Smith claimed the non-hurricane debris included kitchen sinks, barbecue pits, shoes, and footballs. Smith admitted that the problem with non-hurricane debris was not significant. David Mitchell stated that he saw private tree services removing live trees and placing them along the streets.

Hall admitted that Smith may have complained to him about the problem of non-hurricane debris such as live trees (because he remembers there was some removal of live trees) but he denied ever hearing complaints about old appliances or furniture. Bondurant stated that he had never heard of any problems concerning the forced removal of non-hurricane debris. He also explained that the "green" tree limbs and trees were probably caused to lean by the storm and were cut for safety reasons. Melvin Mitchell stated that he was not informed of any complaints concerning non-hurricane debris and he only saw hurricane-related debris. Engel insisted that there was very little non-hurricane debris, if any. Kevin Alves, the Chief of Police for Ocean Springs in 1985, testified that he drove the streets everyday and saw only hurricane-related debris, such as fallen trees and household items.

Schneider admitted that someone complained to him about the removal of non-hurricane debris. He said that he then directed his monitoring teams to observe

the removal of debris for that problem. Schneider also explained that the presence of "green" tree limbs could be due to trees which were blown over by the storm but not killed. Hall stated that when he learned that non-hurricane debris was being placed on the streets, he requested the local governments to investigate the problem and stop any future occurrences. Hall felt that there simply was not a significant amount of non-hurricane debris being removed by the plaintiff. Fulghum stated that he and Engel heard that there was some debris not related to the hurricane on the streets. He said that Pascagoula then made public announcements discouraging the public from placing non-hurricane debris on the streets.

### C. Private Property Removal

Fletcher had also claimed that they complained to city and FEMA officials because their workers were forced to enter private property and remove debris. Childs testified that his crews were directed by city officials to enter private property at the Pascagoula Country Club and remove debris. Childs said that they were also forced to enter a park and some lots to remove debris. Smith testified that in Ocean Springs private citizens stacked debris on the edge of their property, especially on narrow streets. Smith said he was directed to enter the property and remove the debris. According to Smith, this resulted in the Cities forcing him to repair fences and holes in yards. Smith said that he thought he only had to remove debris from the streets where there was obviously no grass or soil which would require replacing. Smith insisted that he voiced these complaints to city officials including Coffman, McPhearson, and Copeland, and FEMA officials, including Bondurant and Hall.

Engel explained that the Pascagoula Country Club is located between Washington Avenue and Ingalls Avenue. He testified that the debris was located in the ditch and on the tennis court which are both adjacent to Country Club Drive, a public street. Engel said that the plaintiff's crews were requested to enter the Country Club's property in order to have easier access to the debris located in the ditch. Engel said he did not know of any other occasions of contractors being requested to enter private property to remove debris. Alves also explained that many streets in Ocean Springs have a right-of-way which extends 50 feet from the center of the street. He stated that debris was piled in private yards adjacent to the streets but that it was situated on the right-of-way. Melvin Mitchell testified that he did not remember anyone directing the plaintiff's crews to remove debris from private property.

### D. Extended Debris Removal and the Lack of Progress

Fletcher and Smith further insisted that their crews were forced to remove debris placed on the streets by private citizens beyond the 20–day period contemplated in the contract. Childs testified that he witnessed people carrying debris to the streets after the initial 20 days had passed and that radio announcers urged citizens to continue to carry debris to streets after the 20–day period expired. He also insisted that he related these complaints to city officials. Smith stated that he thought the contract only required him to remove debris which was placed on the streets during the first 20 days. He said that people brought debris to the streets beyond the 20–day period and he informed the city and FEMA officials. Smith proclaimed that his crews were forced to make as many as eight passes down each street for debris. Smith testified that city officials frequently requested his crews to stop working on one street and move to another location. According to Smith, his crews were also required to remove 13,344 cubic yards of debris from Pascagoula and 33,919 cubic yards of debris from Ocean Springs after the 30–day period under the contract. Smith stated that all of these problems, especially the excessive debris, contributed to the plaintiff having to remove debris beyond the 30–day period.

Schneider testified that he, Melvin Mitchell, and Copeland met to discuss what they

could do about the lack of progress by the plaintiff's crews in removing debris. He pointed out that after two days, the plaintiff's crews were supposed to be moving 7% of the debris per day. He said at that time, only 2% had been removed, when 60% should have been removed already. Schneider thought the delay was mainly due to the plaintiff having an inadequate amount of equipment. Melvin Mitchell and Hall testified that they envisioned that performance of the contract would occur when the contractor made one pass to clear all of the streets (by the end of 15 days) and then another pass to remove the debris brought to the streets during the 20–day period. They insisted that the plaintiff had not completed a first pass after 15 days and that the plaintiff had practically performed no removal within the first few days of the contract. Engel said that the plaintiff was required to make two passes down each street and that the plaintiff's crews were only forced to conduct additional passes if on the first two, the crews failed to remove all of the debris.

Jordan said that soon after the contract performance was to begin, he and other city officials had several meetings with Smith and his employees concerning the lack of progress and lack of equipment. He admitted that the plaintiff eventually fulfilled his contractual duties on time. Fulghum testified that because the contractor had an insufficient amount of equipment, there were complaints about his slow mobilization. He said that he had numerous complaints from people about the lack of progress but that they decreased after the first three to four days. Engel testified that it was three or four days after the contract was signed before the contractor brought a sufficient amount of equipment into the city to get the debris removal started. He also said that there were delays even after the initial three to four day period and that it was "quite awhile" before they started doing a good job. He also noted that part of the delay was due to the plaintiff using a dump site 14 miles outside of town.

### E. Assistance to the Contractor

Several individuals testified that as a result of the plaintiff's delay in its progress on the removal of storm debris, other parties began to assist in the removal of debris. Alves also testified that several different people and organizations assisted the plaintiff in the removal of debris from Ocean Springs. He said that city crews operated four trucks and removed debris from the streets. Alves insisted that a United States Navy Construction Battalion and volunteers from Keesler Air Force Base removed debris from the streets of Ocean Springs for two weeks. Jordan testified that due to the plaintiff's slow mobilization, the city's crews removed debris from streets for two to three weeks, the Navy Construction Battalion brought in equipment and removed debris, and two busloads of volunteers from Keesler Air Force Base removed debris all after the contract had been signed. He concluded that these people removed large amounts of debris. Childs and Smith denied ever seeing C.B.'s (members of the United States Navy Construction Battalion) or city crews removing debris but admitted that private citizens may have removed some debris on their own.

### F. "Hand Pick" Items

Smith also complained of having to "hand-pick" items. Smith testified that city officials required his crews to rake debris in some locations. He said that some of his personnel were forced to clean up debris by hand and this was the only job where that was done. John Engel testified that no one ever required the plaintiff's crews to rake debris in yards.

### G. FEMA's Monitoring Role

Hall testified that FEMA retained some duties and functions even after the debris removal contracts were executed. He said FEMA personnel remained in the areas in a monitoring role (that is, to monitor the progress of debris removed) but that they had no duties concerning the direct administration of the contract. Schneider testified that he retained his personnel who had

prepared the DSRs to work with individual communities in project monitoring. Schneider said that one of FEMA's responsibilities is to effectively monitor all of the projects ongoing (not only debris removal efforts but all public assistance projects) in order to prepare interim and final inspections and alert him to problems with the projects. He said that he had six federal employees and some state and local employees serving as monitors. Schneider explained that each of these people would have been responsible for several applicants (county communities or cities). He admitted that he did not instruct these monitors on their duties. Schneider insisted that he was involved in monitoring in Hancock, Harrison, and Jackson Counties; with solving other problems in other areas of public assistance; and with surveys for sewer and building repairs. He also explained that the monitoring teams worked independently and reported to him once per day. Schneider indicated that the monitors determined the percentage of completion by driving down each street and that the Cities received this information from their own representative on each team. He testified that Exhibit P–25 was a form he used to inform Hall of the percentage of completion of the debris removal. Schneider said that Melvin Mitchell informed him that the contractor was not progressing as rapidly as the contract required him to progress in Pascagoula due to an insufficient amount of equipment.

Schneider said that local citizens also complained that their streets were not being cleared but he admitted that the Cities were attempting to direct the contractor to different areas based on the Cities' priorities. Schneider also insisted that local officials actually conduct the day-to-day administration of the contracts because it is not feasible for FEMA due to its insufficient number of personnel and its large number of programs. He stated that if FEMA administered debris removal contracts, it would seriously diminish it resources and subject it to liabilities.

Bondurant testified that Schneider assigned him the progress of debris removal in Pascagoula. He explained that he and a city official, Engel, would locate the plaintiff's crews and see how much debris they had removed. According to Bondurant, Schneider did not have to instruct him on what his monitoring duties and functions were because Bondurant was familiar with the process. Bondurant said he reported to Schneider virtually every day on the removal progress (*i.e.*, how much debris was removed and the percentage of completion).

According to Guirola, FEMA's role in the removal of debris was limited to reimbursing local governments for their costs and FEMA's personnel had no authority in the day-to-day performance of the debris removal contract except as observers. Guirola characterized FEMA's relationship with the Cities and contractors as an "arms length" relationship. Fletcher, Smith, and Childs stated that they saw Bondurant and other officials practically everyday everywhere they were working.

### H. Prior History

The plaintiff brought its claims against FEMA pursuant to the Federal Tort Claims Act (FTCA) and those claims were based upon FEMA's alleged negligence in the supervision and application of disaster relief efforts in the Cities. The plaintiff's complaint contains four allegations involving FEMA: negligent preparation and negligent use of debris quantity estimates; negligent warranty of the accuracy of debris quantity estimates and negligent failure to disclose material information to bidders; negligent failure to comply with rules, regulations, guidelines, and fundamental purpose; and negligent supervision of employees, agents, representatives, and officials. The contract claims against the Cities are for: breaches of contract caused by FEMA's negligent acts and omissions; breaches of contractual duties during the bidding and contract formation process; and breaches of implied and express contractual duties during contract performance. FEMA asserted cross-claims against the Cities for indemnity and a third-party claim against the State of Mississippi (the State) for indemnity.

Previously, FEMA, the Cities, and the State all moved to dismiss the claims asserted against them. This Court held that the plaintiff did state a claim against FEMA for FEMA's alleged negligent supervision and administration of the disaster debris removal but that any claim against the United States for misrepresentations or interference with contract rights was barred. The Court also denied the Cities' and the State's motions to dismiss finding that the Cities were effectively a third-party defendant against whom the plaintiff had asserted cross-claims. Consequently, the cause proceeded to trial.

### Conclusions of Law

#### I. FEMA

It is generally recognized that the United States is immune from suit, except to the extent that such immunity may have been waived by Congress. See *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976). One of the areas in which immunity has been waived is found in the FTCA. Under the FTCA, claims for monetary damages against government agencies for the tortious acts of their employees can be maintained. Yet this waiver is not without limitation. Congress limited the liability of the United States under the FTCA to that of a private individual under like circumstances. 28 U.S.C. § 2674.

Therefore, a claim against the United States under the FTCA may only be maintained for tortious acts not otherwise excluded and only to the extent that a private individual would be liable under like circumstances. In actions brought against the United States under the FTCA, 28 U.S.C. §§ 1346(b), 2671–2680, the law to be applied by the Court is the law of the place where the alleged negligence occurred. *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Mississippi substantive law applies to the extent there has been a waiver of sovereign immunity because the alleged negligence occurred in Jackson County, Mississippi. The plaintiff relies on a negligence theory to recover. In order to recover the plaintiff must prove by a preponderance of evidence that (1) the defendant owed a duty; (2) the duty was breached; (3) the breached caused the injury; and (4) the plaintiff suffered damages. *Foster v. Bass*, 575 So.2d 967, 972–73 (Miss.1990); *Palmer v. Biloxi Regional Medical Ctr., Inc.*, 564 So.2d 1346, 1354 (Miss.1990); *Phillips v. Hull*, 516 So.2d 488, 491–92 (Miss.1987); *see also, Beck v. Thompson*, 818 F.2d 1204, 1208 (5th Cir.1987). Mississippi also recognizes the doctrine of comparative negligence. *See Purina Mills v. Moak*, 575 So.2d 993, 997 (Miss.1990).

#### A. Negligent Preparation of the Estimates

■ The plaintiff asserts that FEMA's agents negligently estimated the amount of debris in the Cities and that it relied upon those estimates in preparing its second bid which was accepted. Childs, Fletcher, and Smith testified that they relied upon the documents entitled "Preliminary Estimates" and marked as Exhibits P–7 and P–8. Childs, Fletcher, Smith, and David Mitchell testified that there was far more debris in the Cities than those estimates indicated. Guirola testified that he and his engineers knew those estimates were inaccurate because they understated the quantity of debris. FEMA personnel with several years of experience and training in the estimation of the quantities of debris reviewed the debris and calculated the estimates. Some people testified that these estimates were accurate and others claimed that they underestimated the amount of debris. However, an estimate is only an approximation and it is not anticipated that they will be precise, exact, or accurate. These estimates were as precise as they needed to be for FEMA's purposes and the plaintiff has failed to show that FEMA negligently prepared them. Further, it was undisputed that Exhibits P–7 and P–8 were not prepared or distributed by FEMA personnel. Additionally, these estimates warned the contractors that: "[t]he federal, state and local governments make no representation as to the accuracy of these estimates. Each contractor submitting a bid for debris removal shall make his own

estimate of the quantity of debris to be removed and the cost of removal." Consequently, the Court finds that the plaintiff failed to prove that FEMA's personnel were negligent in preparing the estimates and the evidence indicates that the only negligence was that of the plaintiff in failing to follow warnings on the estimates.

### B. Representations of the Accuracy of the Estimates

■ At trial, the plaintiff's witnesses testified that Schneider or Guirola informed the contractors they did not know how to estimate the debris and directed the contractors to rely on the "FEMA estimates" because they were the experts. Thus, the plaintiff's employees contended that FEMA agents negligently misrepresented the accuracy of the estimates. Many witnesses denied that *anyone* ever made statements that the estimates were accurate and should be followed by the contractors. Regardless, Guirola's alleged misrepresentation cannot create liability for the United States because he was not an agent for the United States and Schneider's alleged misrepresentation cannot provide a basis for the United States' liability because of the misrepresentation exception to the FTCA. In *Commercial Union Ins. Co. v. United States*, 928 F.2d 176 (5th Cir.1991), the Fifth Circuit analyzed previous Supreme Court decisions and held:

> These cases suggest a two-step process for determining whether a particular negligence claim is barred by the misrepresentation exception to the FTCA. First, the court must determine whether the chain of causation from the alleged negligence to the alleged injury depends upon the transmission of misinformation by a government agent. If not, *Block* [*v. Neal*], 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) ] holds that the misrepresentation exception does not prevent a waiver of sovereign immunity from the state negligence claim. If, on the other hand, the causal chain does depend on the transmission of misinformation, then the exception applies and there is no waiver of immunity under the Act.

*Commercial Union Ins. Co.*, 928 F.2d at 179. Undoubtedly, under this test, the plaintiff's claim that Schneider misrepresented the accuracy of the debris estimates is barred.

### C. Publication of the Debris Estimates

■ The plaintiff asserts that FEMA should be held liable for permitting the publication of their debris estimates. Hall admitted that these estimates should not have been released. However, there was no regulation or statute which prohibited the publication of the estimates. Schneider testified that he discovered the estimates had been released to the bidders but did not do anything to prohibit further dissemination of them because he felt that if some bidders had access to the estimates, then all of the bidders should have access to the estimates. Hall agreed that his primary concern would have been the bidder's equal access to the estimates. Schneider noted that the local officials released the estimates to allow small contractors a chance to bid on some of the areas.

The discretionary function exception preserves governmental immunity from suit under the FTCA for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Just this term, the United States Supreme Court stated:

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," *Berkovitz* [*v. U.S.* ], *supra*, [486 U.S. 531] at 536, 108 S.Ct. [1954], at 1958 [100 L.Ed.2d 531 (1988) ]; see also *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953); and "it is the nature of the conduct, rather than the status of the actor," that governs whether the exception applies.

*Varig Airlines, supra,* [467 U.S. 797] at 813, 104 S.Ct., [2755] at 2764 [81 L.Ed.2d 660] [ (1984) ]. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Berkovitz,* 486 U.S., at 536, 108 S.Ct., at 1958.

Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Ibid. See Varig Airlines,* 467 U.S., at 813, 104 S.Ct., at 2764. Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *id.,* at 814, 104 S.Ct., at 2765, when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz, supra,* [486 U.S.] at 537, 108 S.Ct., at 1959.

Where Congress has delegated the authority to an independent agency or to the executive branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs. In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

*United States v. Gaubert,* —— U.S. ——, ——, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991). The Court then held:

Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. *See Dalehite, supra,* [346 U.S.] at 36, 73 S.Ct., at 968. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

Not all agencies issue comprehensive regulations, however. Some establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs. Others promulgate regulations on some topics, but not on others. In addition, an agency may rely on internal guidelines rather than on published regulations. In any event, it will most often be true that the general aims and policies of the controlling statute will be evident from its text.

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

In light of our cases and their interpretation of § 2680(a), it is clear that the Court of Appeals erred in holding that the exception does not reach decisions made at the operational or management level of the bank involved in this case. A

discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. Day-to-day management of banking affairs, like the management of other businesses, regularly require judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines, supra,* [467 U.S.] at 813, 104 S.Ct., at 2764.

*Gaubert,* —— U.S. at ——, 111 S.Ct. at 1274–75. Schneider's decision to permit the further release of the estimates is protected by the discretionary function exception because it evidenced the agency's policy of providing equal access to the estimates and no statute or regulation prohibited the publication of the estimates.

### D. The Per–Yard Limit and Use of the FEMA Estimates for Evaluation for the First Bids

 The plaintiff contends that FEMA officials established a ceiling on the amount of funds that FEMA would reimburse the local governments and there was some testimony that FEMA officials stated they would not pay more than $4.00 per cubic yard for debris removal. Nevertheless, the Court concludes that such a requirement could not have caused the plaintiff's damages because the plaintiff's own employees testified that the plaintiff's bids were in $3.00 to $4.00 range on both their first and second bids. The plaintiff also contends that FEMA required the local officials to use the estimates compiled by the FEMA-state-city teams in their evaluations of the first bids. While the Cities' officials relied upon the estimates prepared by the FEMA-state-city teams, no witness testified that FEMA forced the local officials to use those calculations to evaluate the bids. The Court finds that FEMA may have recommended that the estimates be used to evaluate the bids but this recommendation was not negligent since it breached no duty

owed the plaintiff, was simply not unreasonable, and did not proximately cause the plaintiff's damages. Furthermore, the Court notes that FEMA is not liable for its personnel advising the local officials to reject the first bids because that advice was not unreasonable nor did it proximately cause the plaintiff's damages.

### E. Use of the Lump–Sum Contract

 The plaintiff alleges that FEMA required the Cities to use a lump-sum contract for the removal of the debris. None of the witnesses testified that FEMA forced the local officials to use a lump-sum contract. At most, FEMA recommended the use of a lump-sum contract. This Court does not find that such a recommendation was negligent and it did not proximately cause the plaintiff's damages. This recommendation also did not violate the handbooks because the scope of the work was clear. The contract was for the removal of debris located within each city on or adjacent to the public rights-of-way. The scope of work need be no clearer.

### F. The Time Period Between the First and Second Bid Openings

 The plaintiff claims that the three day interval between the first bid opening and the second bid opening was far too short for the plaintiff's employees to re-survey all of the areas and forced the plaintiff's employees to base its bid on the published estimates. The Court finds no proof that FEMA required the local officials to have the second bid opening three days after the first bid opening. However, even if FEMA had set the time for the second bid opening, the plaintiff could not recover because that decision would have been protected by the discretionary function exception. Numerous witnesses testified that the debris was piled in the streets blocking traffic and becoming a fire hazard. Since no statute or regulation mandated a certain time period between rounds of bids, and FEMA's decision would have been based upon the presence of hazards to the public's safety, FEMA could have set the second bid opening within three days of the

first bid opening. Furthermore, considering the emergency conditions, setting that bid on that date was not unreasonable and was not negligent.

### G. Failure to Publish Estimate Three

The plaintiff's witnesses testified that they did not have the third estimate (Exhibit P–10) when they prepared the plaintiff's second bids and that they would have used it to calculate their second bids. However, the Court finds that there was no requirement that the estimates be published and those witnesses admitted that they did not check with the Jackson County Planning Commission between the first and second bids. Again, the estimates (Exhibits P–8 and P–9) had instructed that the "latest estimates are available from the Jackson County Planning Commission." The Planning Commission director, Williams, testified that the estimate, introduced as Exhibit P–10, was available prior to the opening of the second bid. Moreover, the evidence indicated that the failure of the plaintiff's employees to obtain the latest estimate before submitting their bid was the sole negligence under the facts in this case.

### H. Negligent Supervision of the Implementation of Debris Removal Efforts

As previously discussed, FEMA's employees committed no negligent acts implementing the debris removal program. Consequently, the Court concludes that Hall did not negligently supervise the program.

### I. Negligent Administration of the Debris Removal Contract

■ The plaintiff also asserts a claim based upon FEMA's negligent monitoring and administering of the debris removal. The plaintiff contends that FEMA should be liable for all of the Cities' breaches of their contracts with the plaintiff. However, as explained more fully, *infra,* the Cities did not breach their contracts with the plaintiff. Thus, FEMA cannot be held liable for inadequately monitoring the removal of debris. Furthermore, the Court determines that testimony of the witnesses indicated that FEMA's monitoring role was not performed negligently.

## II. *The Cities*

### A. Non–Hurricane Debris

■ The plaintiff asserts that the Cities forced its contractors to remove debris which was not caused by the hurricane. The plaintiff's witnesses testified that they were required to remove significant amounts of non-hurricane debris and the defendants' witnesses stated that there was no non-hurricane debris or, if any, it was insignificant. The City of Pascagoula contract with the plaintiff (Exhibit P–18) and the City of Ocean Springs contract with the plaintiff (Exhibit P–19) both provided:

### Scope of Work

The work shall consist of the removal of debris and wreckage within the boundaries of the City of Pascagoula, which was caused by tornadoes, flooding, and storm damage from Hurricane Elena during the period of September 2, 1985.

* * * * * *

Debris includes, but is not limited to, fallen trees, uprooted trees and uprooted stumps (excluding standing trees) scattered and broken timber, and other commonly used building materials, unrepairable household furnishings, and all other unsalvageable materials located on public property.

(Exhibits P–18 and P–19 at p. 17). The contract indicated that the plaintiff was required to remove all hurricane-caused debris and all "unsalvageable" items located on public property. The plaintiff produced no witness who remembered that he was required to remove salvageable items from public property. In fact, the plaintiff's own witnesses pointed out numerous items that they had seen stacked on the streets and they said these items had been previously damaged. Therefore, the Court finds that the plaintiff has failed to prove that it was forced to remove debris which was not within the definition of "debris" in the contracts.

**1346**

### B. Private Property Removal

The plaintiff alleges that the Cities breached the contracts when it made its crews remove debris from private property. The contract provided:

*Scope of Work*

\*　　\*　　\*　　\*　　\*　　\*

This debris removal will be limited to public roads/street rights-of-way, and other debris immediately adjacent thereto.

\*　　\*　　\*　　\*　　\*　　\*

*General Notes*

It is the intent of this contract to remove, as quickly as possible, all hazards to the general safety of the community caused by debris left on road/street rights-of-way and immediately adjacent thereto in the wake of Hurricane Elena.

\*　　\*　　\*　　\*　　\*　　\*

*Method of Removal*

All debris must be removed from the right-of-way of public streets/roads. Contractor will not leave the public rights-of-way, except at his own risk, to remove debris placed on or adjacent to, the public right of way.

\*　　\*　　\*　　\*　　\*　　\*

At the completion of the debris and stump removal from public road/street rights-of-way, any cavity or hole shall be rough graded to remove any hazardous conditions. The Contractor shall exercise all caution in leaving as much vegetation as possible on these properties. It is required that all holes left by trees, stumps or rootwads (including stump holes or rootwads already created by the removal of stumps by others) be filled by rough grading method. The contractor will be required to locate and acquire common fill materials to fill stump holes and rough grade each stump hole site. Topsoil will not be required.

All uprooted and partially uprooted stumps located on road/street rights-of-way shall be cut off flush with the ground surface or removed. If the Owner deems a damaged or broken tree in the road/street rights-of-way suitable to be retained, the Contractor shall prune all broken and damaged limbs that present a danger. Any tree located within the right-of-way that is leaning onto private property shall be removed unless otherwise directed by the Owner. Any tree on private property leaning over the right-of-way shall be cut or otherwise removed within the right-of-way limit, unless otherwise directed by the Owner.

(Exhibits P–18 and P–19 at pp. 17–19). Thus, it was contemplated that debris removal would "be limited to public roads/street rights-of-way, and other debris immediately adjacent thereto." Childs testified that his crews were directed to enter the Pascagoula Country Club property and remove debris. Engel explained that the Pascagoula Country Club's property is located adjacent to a public street and that the plaintiff's crews were told to remove the debris piled in the ditch and adjacent to the ditch running along the public street. Smith testified that in Ocean Springs private citizens stacked debris on the edge of their property, especially on narrow streets, and he was directed to enter the property and remove that debris. According to Smith, this resulted in the City forcing him to repair fences and holes in yards. Smith said that he thought he only had to remove debris from the streets and there was obviously not any grass or soil in the streets which would require replacing. Alves explained that the rights-of-way in Ocean Springs are 50 feet from the center of the streets and that the rights-of-way frequently cover a good portion of private citizens front yards. He remembered that on one occasion, the plaintiff's workers were complaining about removing debris from private property when they were actually having to remove debris from the right-of-way across the edge of the yard. The Court finds from the plaintiff's witnesses' testimony that they did not understand that the contract required removal of debris from public rights-of-way even if across private property and that the contract required debris removal from property adjacent to rights-of-way. Thus, the Cities did not require the plaintiff to re-

move debris from property not covered by the contract.

### C. Extended Debris Removal and the Lack of Progress

The plaintiff asserts that its crews were forced to remove debris placed on the streets by private citizens beyond the 20–day period contemplated in the contract. The contract provided:

The Contractor shall within thirty (30) consecutive calendar days of the commencement day set forth in the Notice to Proceed remove from the public roads/street rights-of-way all hurricane debris and wreckage deposited within or immediately adjacent to the rights-of-way within twenty (20) days of said commencement date. The Contractor shall be completely mobilized in each debris removal site included in his contract within two (2) consecutive calendar days of said commencement date and shall thereafter be capable of cleaning seven (7) percent of rights-of-way of the total debris removal site each calendar day. In other words, the Contractor shall remove all debris in an orderly manner in the first fifteen (15) days and thereafter remove all debris that may be brought to the road/street rights-of-way on a continuous basis.

The plaintiff offered the testimony of several witnesses that the plaintiff's crews were directed to remove debris in several passes down each street and after the initial 20–day period had passed. According to Smith, his crews were also required to remove 13,344 cubic yards of debris from Pascagoula and 33,919 cubic yards of debris from Ocean Springs after the 30–day period under the contract. Smith stated that all of these problems contributed to the plaintiff having to remove debris beyond the 30–day period. After two days, the plaintiff's crews were supposed to be moving 7% of the debris per day. Several witnesses testified that the plaintiff's progress was unbearably slow. These witnesses thought the delay was mainly due to the plaintiff having an inadequate amount of equipment. Due to the numerous individuals testifying that it took several days

before the plaintiff began to remove debris at more than a snail's pace, this Court finds that the plaintiff's crews were delayed beyond 30 days in performing the contract. But that delay was the result of the plaintiff's slow mobilization, insufficient amount of equipment, and underestimated quantities of debris. The multiple passes were also required as a result of the plaintiff's crews failing to remove all of the debris on their first two passes.

### D. The "Hand Pick" Problem

Smith complained of having to "hand-pick" or rake items. On this matter, the contract provisions stated:

*Clean-up—Initial and Final*

The Contractor will not be required to hand pick every piece of debris from sites. That debris which would normally be considered litter, such as paper, cans, small branches, and other such debris may be left after the final clean-up. Building materials, however, such as bricks, lumber, stone, roofing and other foreign type materials which are defined as debris shall be removed to the point that, in the opinion of the Owner, the job then becomes a matter of dressing and should be left to the home-owners. An area will be considered completely cleaned only after all items of debris or piles of debris larger than 100 cubic inches have been removed.

Smith testified that city officials required his crews to rake debris in some locations, but John Engel disputed this claim. Since no witness could quantify the amount of debris removed in this manner or the amount of time the plaintiff's workers spent "hand-picking" items, the plaintiff has failed to prove its damages for this alleged breach.

### E. Wrongful Inducement

■ The plaintiff contends that immediately prior to the execution of the contract, Smith, Childs, and Fletcher questioned Melvin Mitchell about the existence of more current estimates. According to them, he replied that they should not worry because the City (Pascagoula) would work with them. Smith alleges now that he was

wrongfully induced to sign the contract with Pascagoula. The plaintiff has designated Melvin Mitchell's action as "wrongful inducement" in an attempt to avoid the phrase "fraudulent inducement" and all of the hurdles which accompany that legal concept.

"A contract will be held invalid for fraudulent representations only if the representations were made with knowledge of their falsity, without knowledge of their truth, or under such circumstances that the seller ought to have known of their falsity." *Jackson v. Finley,* 366 F.2d 148, 153 (5th Cir.1966) (citing *Evans v. Malone,* 250 Miss. 214, 164 So.2d 794 (1964)); *see Touchstone v. Bond,* 223 Miss. 487, 78 So.2d 463, 466 (Miss.1955) ("A misrepresentation by a seller of a material fact, inducing the purchase, is a fraud in law....."). In *Credit Industrial Co. v. Adams County Lumber & Supply Co.,* the Mississippi Supreme Court held:

> [T]he rule is well settled that "fraudulent representations upon which a party may predicate any demand for relief must relate to past or presently existing facts, as facts, and cannot consists of promises, except in some cases when a contractual promise is made with the present undisclosed intention of not performing it." *McArthur v. Fillingame,* 184 Miss. 869, 186 So. 828, 829.

The representations involved in the alleged promises which the defendants proposed to prove by J.W. Claughton related neither to past nor presently existing facts, and if proof of such promises had been admitted such proof would not have exonerated the defendant partners from liability on the written instruments sued on in the plaintiffs' declaration. *Salitan v. Horn,* 212 Miss. 794, 55 So.2d 444, 446.

What we have said above is in line with the general rule stated in 23 Am.Jur., pp. 799, 800, *Fraud and Deceit,* 291 par. 38. "It is a general rule that fraud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct, upon the mere failure to perform a promise—nonperformance of a contractual obligation—or upon failure to fulfil an agreement to do something at a future time * * *." The reasons for the rule, as stated by the Court in *Salitan v. Horn, supra,* are "that 'a mere promise to perform an act in the future is not, in a legal sense, a representation, and that a mere failure to perform it does not change its character'." 23 Am.Jur. p. 801.

*Credit Ind. Co. v. Adams County Lumber & Supply Co.,* 215 Miss. 282, 60 So.2d 790, 794 (1952); *see House v. Holloway,* 258 So.2d 251, 253 (Miss.1972); *McArthur v. Fillingame,* 184 Miss. 869, 186 So. 828, 829 (1939). Smith, Fletcher, and Childs stated that Melvin Mitchell said he and the City of Pascagoula would "work with" the plaintiff. The Court finds this a promise to act in the future and the plaintiff may not recover for relying on it since the plaintiff offered no proof that the promise was made with the present intent not to perform. *See McArthur v. Fillingame,* 186 So. at 829. Furthermore, Melvin Mitchell's alleged statements are so nebulous that they do not constitute misrepresentation and it would have been unreasonable for the plaintiff's agents to rely on those statements. Additionally, those statements did not induce Smith to sign the contract. He testified that he had provided a bid bond and had several years experience in the contracting business. He also knew that when his bid was accepted, he had to sign the contract or his bid bonding company would have to pay the City and then sue him for indemnity. Therefore, the Court finds Smith did not rely in any real sense on Melvin Mitchell's statements and further finds the plaintiff may not recover for these statements. *See Jackson v. Finley,* 366 F.2d at 153–154 (affirming the district court's dismissal of a claim based upon virtually the identical facts).

### F. Good Faith and Fair Dealing

■ The plaintiff alleges that the Cities breached their duty of good faith and fair dealing when they used the inaccurate estimates to evaluate and rejected the first set of bids. Mississippi case law recognizes that "all contracts contain an implied covenant of good faith and fair dealing." *Mor-*

*ris v. Macione,* 546 So.2d 969, 971 (Miss. 1989) (citing *UHS–Qualicare v. Gulf Coast Community Hosp.,* 525 So.2d 746, 757 n. 8 (Miss.1987); *Blue Cross & Blue Shield of Miss., Inc. v. Maas,* 516 So.2d 495, 498 (Miss.1987); *see also Perkins v. Thompson,* 551 So.2d 204, 209 (Miss.1989); *Phillips v. Chevron U.S.A., Inc.,* 792 F.2d 521, 524 (5th Cir.1986); *see generally Restatement (Second) of Contracts* § 205; 17 Am. Jur.2d *Contracts* § 256 (1989). Nevertheless, Justice Hawkins of the Mississippi Supreme Court has explained that "[a] necessary ingredient of a bad faith claim is the undisputed existence of some contract...." *Mississippi Farm Bureau Mutual Ins. Co. v. Todd,* 492 So.2d 919, 944 (Miss.1986) (Hawkins, J., dissenting). In the instant case, there was no contract between the Cities and the first group of bidders. The Cities simply invited offers and the contractors made offers in the form of bids. The Cities were free to accept or reject those bids. Consequently, there was no duty of good faith and fair dealing. Nevertheless, even if there was such a duty, the Cities did not breach that duty. The use of the estimates was reasonable since the Cities had a member on the survey teams which calculated the estimates.

### G. The Cities Defenses

 Alves, Engel, and Fulghum testified that as a result of the plaintiff's delay in its removal of storm debris, other parties began to assist in the removal of debris. Alves and Fulghum stated city crews operated four trucks and removed debris from the streets, and United States Navy Construction Battalions and volunteers from Keesler Air Force Base removed debris from the streets of Ocean Springs for two weeks. Thus, if the plaintiff had been entitled to damages for the alleged breach by the Cities, this work by the Cities' crews and volunteers mitigated those damages since they removed debris that the plaintiff was contractually required to remove.

Another relevant part of this contract provided:

8. In any case, where there is a matter of opinion concerning any portion of the specifications, work methods, work to be accomplished, or any other matter concerning this Contract, the final decision shall be that of the Owner.

(Exhibit P–18 and P–19 at p. 13). This provision gave broad discretion to the Cities to interpret provisions of the contract. This Court finds that the Cities' interpretations of the provisions on private property removal, non-hurricane debris, "hand pick" items, removal after 20 days, and removal after 30 days were reasonable and that this "final decision" provision is thus enforceable and not unconscionable.

### Conclusion

The plaintiff has failed to show that the United States was negligent or that the Cities breached their contracts with the plaintiff. Therefore, the plaintiff's complaint should be dismissed with prejudice and judgment entered in favor of the United States and the Cities. Because the United States was not required to pay any damages, the United States' indemnity claims against the Cities and the State of Mississippi are dismissed.

Counsel for the defendant, United States, shall submit a Judgment in conformity with the foregoing Memorandum Opinion within ten (10) days of the entry hereof.