JOHNNY F. SMITH TRUCK & DRAGLINE SERVICE, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–997C.

United States Court of Federal Claims.

May 21, 2001.

Thomas W. Prewitt, Ridgeland, MS, for plaintiff.

E. Michael Chiaparas, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, and Director David M. Cohen for defendant. Ed Bankston, U.S. Army Corps of Engineers, of counsel.

## OPINION

FIRESTONE, Judge.

This contract dispute comes before the court on the government's motion for partial summary judgment. The case arises over a

contract entered into in 1997 between the United States Army Corps of Engineers ("Corps" or "COE") and Johnny F. Smith Truck & Dragline Service, Inc. ("Smith"). Necessitated by the floods in the City of Grand Forks, North Dakota, in the spring of 1997, the contract provided for disaster-related demolition and disposal services. In its complaint, Smith seeks an equitable adjustment for work it completed that it argues went beyond the scope of the contract. In its motion for partial summary judgment, the government counters that, as a matter of law, Smith is not entitled to further payment on the majority of its claims.

For the reasons that follow, the court **GRANTS** the government's motion for partial summary judgment.

## FACTS

### I. Background

#### A. The Contract

The following facts are not in dispute. The City of Grand Forks, North Dakota, was subject to devastating flooding in the spring of 1997. The Corps was assigned responsibility for cleaning up the area. In keeping with this responsibility, the Corps, on June 27, 1997, awarded Contract No. DACW37-97-C-0019 ("Grand Forks contract") to Smith, a Mississippi contractor, to perform disaster cleanup work. The bid schedule for the base contract consisted of four line items:

1. Item 0001, "Demolition, Debris Removal, & Backfill of Homes (Less than 1200 SF [square feet])," with an estimated quantity of five;
2. Item 0002, "Demolition, Debris Removal, & Backfill of Homes (Greater than or equal to 1200 SF)," with an estimated quantity of ten;
3. Item 0003, "Detached Garages—Demolition and Debris Removal," with an estimated quantity of five; and
4. Item 0004, "Waterline Capping," with an estimated quantity of four.

The base contract provided a fixed price of $98,000 (demolition of twenty structures for $90,000 and water capping for $8,000).

The contract bid schedule also included twenty-seven optional items:

1. Items 0005 through 0010, "Demolition, Debris Removal, & Backfill of Homes (Less than 1200 SF)," with an estimated quantity of five structures within each option;
2. Items 0011 through 0017, "Demolition, Debris Removal, & Backfill of Homes (Greater than or equal to 1200 SF)," with an estimated quantity of five structures within each option;
3. Items 0018 through 0026, "Detached Garages—Demolition and Debris Removal," with an estimated quantity of five structures within each option; and
4. The remaining optional items were for "Waterline Capping."

The price for all these options, if exercised, was $211,000. Together, the price of the base contract plus all options, if exercised by the government, was $309,000.

The contract contained the following pertinent provisions. Paragraph 1 of the Scope of Work, GENERAL, provided:

The work under this contract consists of demolition, debris removal, and structural excavation to demolish and remove public and private buildings and appurtenant structures within the city of Grand Forks, ND that were damaged beyond repair and that represent an immediate threat to public safety. The contractor shall provide all labor, plant equipment, machines and tools necessary to perform demolition and removal of structural debris at sites identified by the Contracting Officer's Representative (COR). The contractor shall demolish and remove all structures including basements.... The Contractor shall also remove all debris remaining on each work site surrounding the structure to be demolished under this contract. This includes the debris existing on the work site prior to the Contractor mobilizing to the site.... The bid price for demolition of homes and garages will include all costs of mobilization, demobilization, labor, tools, material, equipment, and everything necessary to demolish, load, haul and dispose of all debris generated by the demolition.

Paragraph 2 of the Scope of Work, SCHEDULE, provided:

The contractor shall mobilize his equipment and crews within thirty-six (36) hours of receipt of the Notice to Proceed.... A production rate of at least 20 work sites demolished, cleared, and backfilled per week (7 days) is required. The contractor is responsible for all necessary permits and utility disconnection's [sic] to insure this production rate.

Paragraph 3 of the Scope of Work, OPTIONS, stated:

The work sites listed as options will be exercised in groups of five work sites at a time.

Paragraph 4 of the Scope of Work, UTILITIES, established:

The contractor shall comply with the requirements of local officials and codes having jurisdiction over the work, including but not limited to, hours of work, abandonment of utilities, and permits.... The contractor shall contact all local officials and utility companies at least 48 hours prior to commencing work on each work site and a record of contacts shall be provided to COR for verification.... The contractor, prior to making any preparations, shall bring to the Contract Officer's attention any work that the contractor considers to be an additional service not included in this contract.

Paragraph 5 of the Scope of Work, SAFETY, provided:

The Government shall accomplish initial identification and removal of hazardous or toxic waste. However some propane cylinders and hazardous waste material may escape detection and be located in the debris. The contractor shall inform the COR immediately upon finding any hazardous material such as propane tanks or other potentially hazardous material. The contractor shall set aside all hazardous materials.... The contractor shall supply workers with personal protective equipment to protect against potential asbestos, chemical and biological hazards.

Paragraph 8.e of the Scope of Work, SCOPE, stated:

All demolition debris shall become the property of the contractor. It shall be the contractor's responsibility to remove from the site and properly dispose of all material. The contractor is required to submit disposal site permits before work begins. All disposal fees are the responsibility of the contractor.

Paragraph 8.h of the Scope of Work, SCOPE, provided:

The contractor shall coordinate with the COR and city to remove any inoperable automobiles, trucks, boats, and trailers that obstruct or impede demolition and debris removal.

Paragraph H.2 of the Special Contract Requirements, OPTION TO EXTEND SERVICES, provided:

The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months.

And paragraph H.3 of the Special Contract Requirements, OPTION TO EXTEND THE TERM OF THE CONTRACT, provided:

The total duration of this contract, including the exercise of any options under this clause, shall not exceed 6 MONTHS.

The contract also contained the following standard Federal Acquisition Regulation ("FAR") provisions: I.36 Disputes, I.37 Differing Site Conditions, I.38 Site Investigation, and I.40 Permits and Responsibilities.

## B. Smith's Work Under the Contract

In order to carry out the contract, Smith developed a plan to haul the debris generated from its demolition activities to a central location where it would burn the material and use the resulting ash as fertilizer. Smith applied to the North Dakota Department of Health ("Department") for the permits needed to burn the debris. By letter dated June 27, 1997, the department approved Smith's permit and specified that, "the type of waste combusted in the unit is limited to wastes such as clean wood and construction, renovation and demolition wastes." The Department further cautioned Smith: "Municipal

solid waste cannot be combusted in the unit and all plastics, asbestos, asphalt shingles, and other materials that would produce excessive smoke must be removed prior to combustion of the waste." The Department also specified that "any asbestos-containing material must be separated from debris and disposed of in accordance with the requirements of the North Dakota Air Pollution Control Rules."

With its combustion permit in place, Smith mobilized and began performing the base contract on July 2, 1997. Between July 4, 1997, and August 16, 1997, the government released all of the base contract and option structures for demolition. Separate and apart from these structures, the Corps also contracted with Smith to demolish additional structures. On August 5, 1997, the Corps and Smith entered into the first of several bilateral modifications in which the Corps agreed to pay Smith for additional demolition and disposal work. Under these modifications, Smith received more money for its services than it had received under the base contract ($4500 per small house and $1500 per garage versus the base contract rates of $2400 per small house and $800 per garage).

Shortly before Smith finished burning materials at its burn site, the contractor received a letter from the State of North Dakota informing Smith that it would need to shut down its burn operation once its permit expired on September 1, 1997. On August 27, 1997, the North Dakota Department of Health wrote to Smith stating the following:

Our Department has received several complaints regarding operation of your air curtain destructor at the ... site in Grand Forks, North Dakota. In addition, the Grand Forks Planning and Zoning Commission has indicated that use of the unit at the current site is inconsistent with zoning and has recommended to our Department that our approval be revoked.

After consideration of the above, it is the Department's determination that the unit will not be allowed to continue operation at the current location after the current city fire permit expires on September 1, 1997.

With respect to cleanup of the site, all material, including ash and screenings must be removed to a landfill permitted to accept such material, no burial on-site is authorized (see attached letter to Darrell Adams).

Darrell Adams was the owner of the land on which Smith was burning the debris from the work sites. The Department wrote Mr. Adams a letter on August 22, 1997, reminding him that "burial on your site is not authorized. Your site is not a permitted landfill."

In reaction to these letters, Smith wrote to the Corps invoking the contract's Differing Site Conditions clause. Smith wrote: "Pursuant to the Differing Site Conditions Clause of our contract, we have been notified by the North Dakota Department of Health that some of the mixed material on our disposal/dump site contains materials not to be handled under our contract." Smith further requested the Corps' "direction on how to proceed."

In its response back to Smith, the Corps rejected Smith's contention that North Dakota's insistence on off-site disposal of Smith's burn-site wastes presented a "differing site condition," and further explained, in its September 15, 1997 letter to Smith:

Your company elected to obtain a site and burn the debris from the demolition operation at this site. Permits were obtained from the North Dakota Department of Health and the City of Grand Forks that established the conditions under which your burning operation was allowable at the site selected.... Compliance with these permit requirements is strictly a contractor responsibility.

Smith completed its work under the contract on or about September 3, 1997. The total price of the contract, including the options and modifications, was $422,250.

## II. Procedural Posture

### A. The Certified Claim

On September 1, 1998, Smith submitted to the Corps' contracting officer ("CO") a for-

mal claim for $387,010.[1] Smith argued that it was entitled to this equitable adjustment to the contract price under the Changes Clause and/or the Differing Site Conditions Clause of the Grand Forks contract. The CO, Patrick Peine, responded to each of Smith's claims in a letter dated December 17, 1998. The claims relevant to this litigation and the CO's responses may be summarized as follows:

*Failure to Release Work Sites.* Smith claimed the contract obligated the Corps to release structures for demolition at a rate of twenty per week, and that its failure to do so resulted in damages cited as "fixed costs" for one month, or $155,994.[2] The CO denied the claim in full, saying: "The Contract did not obligate the Government to exercise any of the options nor is there any clause in the Contract that obligated the Government, if it chose to exercise options, to exercise options at a rate which would make 20 sites per week available to the contractor."

*Structure Contents.* Smith claimed that by the terms of the contract, it was not required to dispose of "household goods" found on the Grand Forks work sites, but it was instead only responsible for "structural debris." Because it encountered "household goods" such as refrigerators, beds, couches, clothes, toys, etc., in "each and every home and garage," Smith claimed that disposing of these items fell outside the scope of the original contract and increased the contract costs. Smith claimed damages of $87,998.[3] The CO denied the claim in full, relying on a plain reading of the contract. He held that the dictionary definition of "debris" includes "the remains of anything broken down or destroyed; ruins; fragments; rubbish," and thus the "household goods" left behind from the flood were included within the scope of the term "debris."

*Inspection Delay.* Under the contract, the Government was obligated to "accomplish initial identification and removal of hazardous or toxic waste." Smith claimed the COE caused a work delay by failing to identify and remove hazardous waste from some sites in a timely manner, causing delays averaging thirty minutes per structure where such wastes were found. The cost of each thirty-minute delay allegedly cost Smith $159.08, and Smith claimed that it experienced delays at seventy-eight work sites. The contractor therefore claimed damages of $12,408.24. The CO agreed that there had been some inspection delays, but after reviewing the evidence submitted by Smith to substantiate the damages, the CO found there had been only one delay of a single half-hour, with resulting damages of $52.50.

*Utility Delay.* Smith also claimed damages for some delays caused by natural gas leaks at three sites. The contract provided: "Other Government agencies may be working in the area, however all coordination and direction shall be made through the COR." Smith alleged that it was the COE's failure to coordinate work with utility companies that lead to its delay damages. Smith claimed damages of $3,946, resulting from its fixed costs during three separate work delays totaling 6.5 hours. The CO denied the claim because the contract expressly provided: "The contractor is responsible for all necessary permits and utility disconnection's [sic] . . . ."

*Concrete Removal.* Smith argued that a differing site condition—the presence of unusually large concrete blocks on two work sites—cost it $910 in damages. Af-

---

1. In addition to the amounts attached to each element of its complaint, Smith made a claim for $10,000 for outside proposal preparation and administration, $20,571 for home office expenses (calculated as 6.21% of the cost), and a 10% profit of $35,183.

2. Between July 20, 1997, and September 3, 1997, Smith claimed that only an average of eight structures were released per week. According to Smith, this represented "a reduction in the contract minimum requirements by 60%." Smith's calculation of damages therefore accounted for a delay consisting of 60% of seven weeks, or approximately four weeks. Smith accordingly requested fixed costs for one month, equaling $155,994.

3. This total is comprised of the following costs: $41,802 for hauling the items to the burn site; $20,370 for separating the items from burnable materials at the burn site; $9,559 for hauling the "household goods" to a landfill; and $16,267 in dump fees.

ter reviewing the evidence, the CO granted Smith $1062.95 in damages. This claim has been paid in full by the government. *Removal of Ash.* Finally, Smith claimed that because it was not allowed to dispose of the demolition debris or ash as originally planned, it suffered increased costs. Smith claimed $60,000 in damages associated with the required cleanup and hauling. The CO denied the claim in full, finding that under the terms of the contract Smith was responsible for removing and disposing, at its expense, all debris and materials on site: "All demolition debris shall become the property of the contractor. It shall be the Contractor's responsibility to remove from the site and properly dispose of all material. The contractor is required to submit disposal site permits before work begins. All disposal fees are the responsibility of the contractor."

## B. This Litigation

Smith filed this suit on December 13, 1999, seeking review of the CO's denial of the bulk of its claims for equitable adjustment. Smith asks for judgment in the amount of $387,010 plus interest and costs.

Following the close of discovery, on October 31, 2000, the government filed for partial summary judgment on four counts of Smith's complaint: the debris claim; the release of structures claim, the natural gas utility delay claim; and the ash disposal claim.[4] On January 17, 2001, Smith filed its response to the government's motion together with the affidavit of Wayne Fletcher, Vice President, Comptroller of Johnny F. Smith Truck & Dragline Service, Inc. at the time the lawsuit was filed. Mr. Fletcher was involved in the bidding and administration of the subject contract. In its response, Smith argues in part that the contract terms are ambiguous and that a trial is needed to discern the parties' intent. Smith also argues that there are certain factual disputes, particularly with respect to the number of structures made available for demolition, which preclude an award of partial summary judgment for the government.

The court heard oral argument on the government's motion for partial summary judgment on May 7, 2001.

## DISCUSSION

### I. Standard of Review

This case turns on questions of contract interpretation that are properly before this court on motion for summary judgment. *Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996); *Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 223 (1990). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### II. The "Debris" Claim

The government argues that Smith's claim for additional costs associated with the disposal of "household goods" such as refrigerators, couches, toys, etc., found at the various structures it demolished is unfounded. The government contends that under the contract, Smith was required to dispose of *all* debris associated with its demolition activities, including the contents of the houses and garages that were condemned for demolition. The government notes that the contract expressly stated that the "work consists of demolition, *debris removal,* and structural

---

4. These claims are virtually identical to those argued before the CO and described in section II.A., *supra.*

excavation to demolish and remove public and private buildings ... that were damaged." (Emphasis added.) The contract went on to state that bid prices for demolition of homes and garages were to include all costs necessary "to demolish, load, haul, and dispose of *all debris* generated by the demolition." (Emphasis added.) The contract further provided that it is "the contractor's responsibility to remove from the site and properly dispose of *all material*," and that, "all disposal fees are the responsibility of the contractor." (Emphasis added.)

According to the government, the contract expressly identified only two exceptions to the contractor's broad demolition and disposal responsibilities: 1) hazardous materials; and 2) "any inoperable automobiles, trucks, boats, and trailers that obstruct or impede demolition and debris removal." With respect to the hazardous materials, the contract provided that "the government shall accomplish initial identification and removal of hazardous or toxic waste." Regarding automobiles and boats, the contract provided for local government agencies to remove any cars and boats hindering the contractor's demolition operations at any particular work site.

In such circumstances, the government contends, Smith could not reasonably have believed that the contract did not require Smith to demolish and dispose of all the contents of the condemned properties. The government further argues that even if the court agrees with Smith and concludes that the term "debris" is ambiguous, Smith had a duty to inquire as to the meaning of the term. According to the government, because Smith failed to timely seek clarification of the term "debris," Smith is not entitled to an equitable adjustment based on its proposed reading of the contract.

Smith argues that the government is not entitled to summary judgment on the debris claim because the proper reading of the contract is in dispute. Smith argues that under the contract it was only obligated to dispose of "structural debris," i.e., the debris generated as a direct result of its demolition activities, and that it was not required to dispose of anything within the houses or garages.

Smith contends that the extra expenses it incurred in separating and disposing of "household goods" constituted a change to the base contract that resulted in additional costs amounting to $87,998 for hauling, separating, and dumping the "extra material."

In support of this contention, Smith argues that under the Scope of Work it was only required to demolish "structures," then to dispose of the resulting "structural debris." In particular, Smith argues that the contract described the work as consisting of "demolition, debris removal, and structural excavation to demolish and remove public and private buildings and appurtenant structures." Smith therefore contends that it reasonably believed it was responsible only for demolishing and disposing of the "structures." In addition, Smith notes that the contract provided that Smith was to "remove all debris remaining on each work site surrounding the structure." Smith argues that the contract's focus on debris "outside" the structures plainly meant that debris "inside" the structures was not included. Further, Smith argues that because the contract addressed the need to "haul and dispose of all debris generated by the demolition," the disposal of debris found inside the structures was excluded since it would not, by its terms, be "generated by the demolition."

Finally, Smith relies on the affidavit of Mr. Fletcher to explain that Smith's circumscribed interpretation of the term "debris" was reasonable given its work crew's alleged observance of other contractors hauling household goods away from some work sites during its pre-bid inspection. In addition, Mr. Fletcher explained that based on his experience in the demolition business, a contractor would only reasonably believe that it was responsible for disposing of household goods if the contract expressly stated that household goods were included. Contrasting with the Grand Forks contract that did not mention household goods at all, Mr. Fletcher argued that the industry "extensively" uses the terms "household goods" or "contents therein" to encompass the disposal of destroyed household goods in disaster demolition contracts. By way of example, Mr. Fletcher pointed to Smith's contract with the

Corps for similar demolition services following Hurricane Andrew. Under that contract, the contractor was directed to remove "mixed debris" from work sites. "Mixed debris" was expressly defined in the Hurricane Andrew contract as: "Construction and Demolition (C & D), mobile home park debris, organic materials, white goods, brown goods, and general household and yard waste generated by the hurricane."

■ The court's analysis of the term "debris" begins with the plain meaning of the contract between the government and Smith. *Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed.Cir.1998). Whether the Grand Forks contract is ambiguous presents a question of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir. 1985). The court need only reach Smith's competing interpretation of the contract if it finds that the term "debris" is an ambiguous term. *Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1578 (Fed. Cir.1993) (citing *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 427 F.2d 722, 725 (1970)). "Where a contract is not ambiguous, the wording of the contract controls its meaning and resort cannot be had to extraneous circumstances or subjective interpretations to determine such meaning." *Perry & Wallis*, 427 F.2d at 725 (citing *Duhame v. United States*, 127 Ct.Cl. 679, 119 F.Supp. 192, 195 (1954)).

■ Here, numerous clauses in the Grand Forks contract make the Scope of Work clear on its face and the language unambiguous. The contract plainly provides that Smith would be responsible for "debris removal," that the bid price should include the cost for "everything necessary to demolish, load, haul and dispose of all debris generated by the demolition," and that "it shall be the contractor's responsibility to remove from the site and properly dispose of all material." The terms "debris" and "material" are both commonly accepted to encompass the types of ruined "household goods" at issue here.[5] "In construing a contract, the language of the instrument is given its ordi-

nary and commonly accepted meaning unless it is shown that the parties intended otherwise." *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 976 (1965). Therefore, given the broad and unqualified use of the terms "debris" and "material" in the Grand Forks contract, the court finds Smith's narrow reading is not reasonable and does not, as a matter of law, create an ambiguity in need of clarification. *See Community Heating*, 987 F.2d at 1579 ("A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language."). "[T]he presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a reasonable contractor would have perceived in studying the bid packet." *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed.Cir.1997).

While it is true, as Smith argues, that the term "debris" is sometimes found in the Grand Forks contract in close proximity to the word "structure," there is nothing in the contract to suggest that the term "debris" is limited to "structural debris." There is no doubt that Smith was responsible for removing structural debris, but the contract plainly did not limit Smith's responsibilities to such debris. If the contract were so limited, there would have been no reason to mention the disposal of "all material." Smith's contention that it reasonably believed it was not expected to both demolish and dispose of the contents remaining in the condemned homes and garages is simply not supported. The contract plainly calls for the demolition of the homes and garages identified, without limitation. In such circumstances, Smith's narrow reading of the contract is not reasonable, precluding a finding that the contract is ambiguous.

Having concluded that the contract is plain on its face, it is not necessary for the court to examine extrinsic evidence presented by Mr. Fletcher regarding his observations at the time of the pre-bid inspection and his contentions about the phrasing of typical demolition

---

**5.** The *American Heritage Dictionary* defines "debris" as: "1. a. The scattered remains of something broken or destroyed; rubble or wreckage.

b. Carelessly discarded refuse; litter." *American Heritage Dictionary of the English Language* (4th ed.2000).

contracts. "[W]hen the provisions of a contract are clear, 'the court may not resort to extrinsic evidence to interpret them.'" *HRE, Inc. v. United States,* 142 F.3d 1274, 1276 (Fed.Cir.1998) (quoting *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996)). "Outside evidence may not be brought in to create an ambiguity where the language is clear." *Id.* (quoting *City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994)). "Neither a contractor's belief nor contrary customary practice ... can make an unambiguous contract provision ambiguous, or justify a departure from its terms." *Hoffman Constr. Co. of Ore. v. United States,* 40 Fed.Cl. 184, 192 (1998) (quoting *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1572 (Fed.Cir.1990)). Indeed, the Federal Circuit has recently held that, "affidavits describing a supposed common industry practice ... are simply irrelevant where the language of the contract is unambiguous on its face." *Jowett, Inc. v. United States,* 234 F.3d 1365, 1369 (Fed.Cir. 2000).

■ However, even if this court were to assume *arguendo* that this contract was ambiguous because it called for the disposal of "all material," but did not expressly identify "household contents," the government would still be entitled to summary judgment, because the ambiguity argued by Smith would be "patent." "It is well settled in this court that 'an ambiguity is patent when there is an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap.'" *H.B. Zachry Co. v. United States,* 28 Fed.Cl. 77, 81 (1993) (quoting *Fry Communications, Inc. v. United States,* 22 Cl.Ct. 497, 504 (1991) (internal quotations omitted)).

Mr. Fletcher's affidavit makes plain that a demolition contractor needs to know the extent of its disposal obligations, and that reasonable and prudent contractors will inquire when a contract is unclear. In particular, Mr. Fletcher contends that "debris" is "extensively" defined in industry contracts as either including or excluding "household goods." Smith therefore should have found it striking that the Grand Forks contract provided *no* express guidance regarding the terms "debris" and "materials." Accordingly, the use of the broad and unlimited terms "debris" and "materials," together with the contract's silence regarding "household goods," should have put Smith on notice that there was a "glaring gap" in the contract demanding clarification. Smith should have been further alerted that its narrow interpretation was potentially wrong by the fact that the contract identified special rules for hazardous waste disposal and for the disposal of cars and boats, but did not mention any other exceptions.[6]

■ Under these circumstances, Smith should have questioned the government about the full scope of its responsibilities. "If a contract contains a patent ambiguity, the contractor is under a duty to inquire and must seek clarification of the proper contract interpretation." *Community Heating,* 987 F.2d at 1579 (citing *Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433 (Fed.Cir.1992)). "The existence of a patent ambiguity in the contract raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation." *Fortec Constructors,* 760 F.2d at 1291 (citing *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649–50 (1982)). "Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor." *Triax,* 130 F.3d at 1475.

■ The purpose of this duty to inquire is to prevent the precise situation presented

---

**6.** The court notes that Smith's claim that it did not believe it was responsible for disposing of "household items" is largely a result of Smith's failure to inspect the Grand Forks work sites. In this connection, the court notes that Mr. Fletcher's contention that the contractor could not adequately inspect the contents of the structures, because many of them were cordoned off, is not an excuse that relieves Smith of its duty to inquire. Because the Grand Forks contract contained the standard FAR language requiring the contractor to investigate the work site, Smith was obligated to inspect, or face the consequences it is now facing. *See, e.g., Hunt & Willett, Inc. v. United States,* 168 Ct.Cl. 256, 351 F.2d 980, 985 (1964) (holding that where a government contract contains an inspection clause casting responsibility on the contractor as to the character, quality and quantity of material to be encountered on site, insofar as this information could have been ascertained by an inspection of the site, the contractor has no claim).

here. "[T]he duty of inquiry prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted." *Triax*, 130 F.3d at 1475. Indeed, Smith had previously litigated with the government over a similar issue in a case arising under another demolition contract. In *Fridge Construction Co., Inc. v. Federal Emergency Management Agency*, 797 F.Supp. 1321 (S.D.Miss. 1991), which involved Smith's cleanup work following Hurricane Elena in 1985, Smith filed an action challenging whether the contract that required the disposal of "hurricane debris" properly included items such as kitchen sinks, shoes, and footballs, that were, Smith argued, "salvageable." [7] *Id.* at 1337. The fact that Smith was involved in litigation over the definition of debris in *Fridge Construction* amply illustrates that Smith should have known the importance of asking the Corps about the allegedly confusing contract terms before bidding on the Grand Forks contract. In this case, Smith was certainly a "knowledgeable bidder" and should have recognized its duty to inquire. *See Dalton v. Cessna Aircraft*, 98 F.3d 1298, 1306 (Fed.Cir. 1996).

■ In sum, the government is entitled to partial summary judgment on its claim that the plain terms of the contract required Smith to dispose of all material and debris at the work sites, including the contents therein such as ruined household goods. As discussed above, the court finds that the contract was plain on its face, and in the alternative, to the extent Smith's past experience should have led it to believe that the term was ambiguous, that same experience should have put Smith on notice of its duty to inquire. Having failed to inquire, Smith is bound by the plain words of the contract.

### III. The Structure Release Rate Claim

■ The government argues that it is entitled to summary judgment on Smith's claim for additional payment associated with the Corps' alleged failure to release structures at a rate of twenty per week for demolition. The government contends that under the plain terms of the contract, the Corps never committed to make twenty structures per week available. In the alternative, the government argues that even if this court agrees with Smith that the Grand Forks contract established a rate for the release of structures for demolition, the government in fact achieved that rate. Because the court finds that the contract established no such rate, it does not reach the question of whether in fact the government released an average of twenty structures per week. [8]

To support its interpretation of the plain meaning of the contract, the government highlights a number of features of the contract itself. First, the base contract only obligated the Corps to release twenty structures in *total*. The bid schedule for the base contract consisted of three line items related to the demolition of structures: Item 0001,

7. The district court did not reach the issue of the proper definitions of the contract terms "debris" and "salvageable," because the court ruled against Smith on an evidentiary matter. The court held that Smith had failed to prove that it was forced to remove debris which was even arguably not within the definition of "debris" in the contract. "The plaintiff produced no witness who remembered that he was required to remove salvageable items from public property." *Fridge Constr.*, 797 F.Supp. at 1345.

8. According to the government, by July 25, 1997, it had exercised all of the options for the demolition of small houses and detached garages, and by August 16, 1997, the government had exercised all the options for large houses and small houses with garages. Between July 2, when Smith started performance, and August 16, the government therefore claims to have released to Smith for demolition the twenty base contract structures and 108 structures covered by options. The government argues that there were some weeks when fewer than twenty structures were released, and other weeks when more than twenty structures were released, and that the resulting release rate "average" was approximately twenty structures per week. While Smith does not appear to dispute the number or date of the Corps' individual releases of base contract and option structures, it does dispute that the weekly "average" satisfied the alleged required weekly rate of twenty sites. Because the court concludes that the government was not obligated to release twenty structures per week, it does not reach the government's argument that it in fact met the alleged release rate obligation.

"Demolition, Debris Removal, & Backfill of Homes (Less than 1200 SF)"; Item 0002, "Demolition, Debris Removal, & Backfill of Homes (Greater than or equal to 1200 SF)"; and Item 0003, "Detached Garages—Demolition and Debris Removal." The estimated quantity for Item 0001 was five, for Item 0002 was ten, and for Item 0003 was five. According to the government, "These 20 structures were the only work sites that were guaranteed under the contract to be released for demolition."

Second, the government notes that while the contract options provided for the demolition of an additional twenty-seven groups of structures consisting of five structures each, the options were to be exercised at the government's sole discretion, and thus Smith could not count on demolishing any more than the twenty structures included in the base contract. The contract itself adopted the standard FAR options language, providing that, "The Government may require continued performance of any services within the limits and at the [labor] rates specified.... The Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the Schedule."

Third, the government argues that the express terms of the option provisions are incompatible with the notion that the government was obligated to release twenty work sites per week. In particular, under the terms of the option provisions, the government could lawfully have taken as long as six months to exercise the contract options: "The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months." Additionally, the government highlights the fact that the option provisions stated: "The work sites listed as options will be exercised in groups of five work sites at a time."

For its part, Smith argues that summary judgment is not appropriate on the grounds that the contract is ambiguous, because under its reading of the contract, the government was obligated to release twenty structures per week to Smith for demolition. According to Smith, the following provision within the Scope of Work should control:

"A production rate of at least 20 work sites demolished, cleared, and backfilled per week (7 days) is required." Smith also relies on Mr. Fletcher's affidavit, in which he states that Smith understood the contract to *require* the contractor to have a large enough crew on hand to demolish twenty sites per week, and therefore Smith was reasonable in believing there was a mutually-binding obligation on the government. Mr. Fletcher stated:

> The contract language that "[a] production rate of at least 20 work sites demolished, cleared, and backfilled per week (7 days) is required" meant to me, and frankly to others whose comments in the pre-bid meetings so indicated, including comments of Corps' representatives, that additional work areas would be released at a rate that satisfied the contract language.... [W]e anticipated and based our bid upon an anticipation that the additional sites would be released at a rate to meet the "required" production schedule.

Significantly, Smith does not dispute that the government had complete discretion regarding the exercise of the contract options and the award of any contract modifications allowing Smith to demolish additional structures during the contract performance period. Mr. Fletcher in his affidavit also stated:

> I am not saying that when we submitted our bid that Smith believed that it could require the Corps to release more work areas to us than the contract quantity but I am saying I believed that, as additional work sites were release [sic] by Grand Forks to the Corps, that additional work sites would be released to Smith [at a rate of twenty per week].

To complete its argument, Smith further alleges that the government failed to meet the twenty structures per week rate established by the contract. According to Mr. Fletcher:

> The work sites were not, however, released in sufficient quantity to satisfy the 20 work sites per week requirement. After two weeks of work it was apparent that two crews were unnecessary; in fact, beginning the third week, Smith had only one

crew and even then, the sites were not released at a 20 work site per week rate.

As noted above, in order for the court to find an ambiguity within this contract, the court must first find that the contractor's interpretation of the contract is reasonable. "A contract provision is deemed to be patently ambiguous if it is susceptible of two different yet reasonable interpretations, each of which is consistent with the contract language and with the other provisions of the contract . . . ." *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir. 1997) (citing *Community Heating,* 987 F.2d at 1579). Moreover, in interpreting this contract, the court must read the disputed language "in the context of the entire agreement" and "construe the contract so as not to render portions of it meaningless." *Dalton,* 98 F.3d at 1305 (internal citations omitted).

Here, Smith's case rests on a single provision:

> The contractor shall work expeditiously to obtain permits and proceed with the work. A production rate of at least 20 work sites demolished, cleared, and backfilled per week (7 days) is required. The contractor is responsible for all necessary permits and utility disconnection's [sic] to insure this production rate.

The focus of this provision, however, is entirely on the contractor. There is nothing in the language of the provision to suggest any obligation on the part of the government. As such, the court finds that the inclusion of the reference to the twenty houses per week indicated only that Smith was obligated to have the capacity to meet that need, not that the government promised to release structures at that rate.[9]

In addition, if the "20 work sites demolished, cleared, and backfilled per week" provision is considered in the context of the entire contract, Smith could not reasonably have believed that the government guaranteed that it would be given twenty structures per week to demolish. The base con-

tract provided for only twenty structures in total, and the twenty-seven options, which identified an additional 135 structures in total, were only to be released, if at all, in batches of five structures at a time. Under standard option clause language such as that included in the Grand Forks contract, "the Government, at its discretion, ha[s] a broad, unilateral right either to exercise the option periods or not to exercise them." *Aspen Helicopters, Inc. v. Dept. of Commerce,* GSBCA No. 13258–COM, Sept. 30, 1999, 99–2 BCA ¶ 30,581, at 151,024, 1999 WL 795489. "The United States Claims Court, the predecessor court to the United States Court of Federal Claims, likewise stated: '. . . A standard option provision in a government contract obliges the contractor to perform the additional contract work if the government chooses to exercise the option, but it does not create a legal obligation on the part of the government to exercise the option and require the work.' " *Green Mgmt. Corp. v. United States,* 42 Fed.Cl. 411, 434 (1998) (citing *Dynamics Corp. of Am. v. United States,* 182 Ct.Cl. 62, 389 F.2d 424, 431 (1968). *Gov't Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 813 (Fed.Cir.1988)).

Moreover, under the contract terms, the government had up to six months to release the twenty base contract structures and the twenty-seven option groups to Smith. Thus, to accept Smith's reading of the contract and hold the government to a twenty structure per week "release rate" would require the court to ignore the option provisions, which plainly gave the government the discretion not only to release or not release any additional structures, but also to release those structures at a rate of fewer than twenty per week. Under the terms of the contract, the government had the discretion to exercise only one or two options per week (releasing five or ten structures per week to Smith). In so doing, the Corps would not have fulfilled the alleged release rate requirement of twenty structures per week, but would have been in compliance with the express terms of the

---

9. Indeed, Smith admits that when work slowed down, it let go of its second crew, because there was not enough work to justify the expense: while Smith "manned the job initially with two crews . . . beginning with the third week, Smith

had only one crew." There is no evidence that the government ever objected to Smith's reduced crew size, which further indicates that there was never a mutually-binding commitment.

option provisions of the contract. In those circumstances, the court cannot accept that Smith's interpretation was "reasonable." The court cannot read a single contract provision in isolation. *Zachry Co.,* 28 Fed.Cl. at 80 ("contract clauses cannot be interpreted in isolation") (internal quotations omitted). The government is accordingly entitled to summary judgment on this issue.

■ But again, even if this court were to hold that Smith's interpretation was "reasonable" and deem the contract ambiguous, the ambiguity would have been plain from the face of the contract, and therefore would be patent. As such, the government would still prevail. Here, the statements in the option provisions to the effect that the government had the discretion to exercise any of the twenty-seven options, that each option would only be for "groups of five work sites," and that the government had "6 months" to exercise the options certainly should have put Smith on notice that the government might not be obligated to release twenty structures per week. The apparent conflict between Smith's view of the government's obligation and the option provisions language should have triggered Smith's duty to inquire. As mentioned above, having failed to inquire, Smith cannot now object to the government's construction of the contract. "If a solicitation contains contract language that is patently ambiguous, a protestor cannot argue . . . that its interpretation is proper unless the protestor sought clarification of the language from the agency before the end of the procurement process." *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 998 (Fed.Cir. 1996) (citations omitted). Accordingly, even if Smith's construction of the contract were to be accepted as "reasonable," the government is entitled to summary judgment on this claim.

## IV. The Natural Gas Utility Delays Claim

■ The government argues that it is also entitled to summary judgment on Smith's claim for $3,946 in delay costs because in a few instances, the natural gas lines hadn't been properly shut off at work sites by local utility crews in advance of Smith's arrival to begin demolition. The government argues that the Corps was not responsible for the delay under the terms of the contract, and therefore the government cannot be held liable for any delays.

In making its claim for damages, Smith does not allege that the Corps failed to perform its duty to coordinate work under the contract. Mr. Fletcher stated in his affidavit that he clearly understood that it was Smith's job to coordinate with local utility officials: "We agree that Smith had the duty to coordinate with the utilities before beginning work on any site. We did that." Mr. Fletcher also recognized that it was the local gas company that caused the problem:

> Our claim though is for delays experienced after we had coordinated with the gas company and secured its permission to start work only to discover that the gas company had not properly located some of the lines and had not turned the gas off. Our operator could not know that the line was in his way and certainly we could not know that the gas had not been turned off. Even though we were not negligent, we had to leave the site until the site was safe for us to return. We anticipated that the sites would be safe if we performed our contractual duty.

Smith apparently believes that simply because it was without fault in causing the delays, it is entitled to compensation from the federal government. This argument is without merit. The contract expressly made Smith responsible for coordinating with local officials and local utility companies regarding its upcoming demolitions. The contract provided, "The contractor is responsible for all necessary permits and utility disconnection's [sic]," and, "The contractor shall contact all local officials and utility companies at least 48 hours prior to commencing work on each site." It is unfortunate that the gas utility company was not as vigilant as it should have been in shutting off the natural gas at all times. This, however, was not the federal government's responsibility. As such, the government cannot be held liable for the delay. *See PCL Constr. Servs., Inc. v. United States,* 47 Fed.Cl. 745, 801 (2000) (holding that in order for a contractor to recover for

an alleged compensable delay, one of the things it must demonstrate is "that the delay proximately was caused solely by the government's actions"). The government's motion for summary judgment on this claim is therefore also granted.

## V. The Ash Claim

▮▮▮ Lastly, the government argues that it is entitled to summary judgment on Smith's claim that the Corps is responsible for the increased costs that Smith incurred in connection with the disposal of the ash it generated from its debris-burning operation. Smith claims that the Corps failed to adequately identify and remove hazardous wastes from the work sites prior to Smith's demolition activities, which resulted in hazardous materials being burned along with other demolition debris, which in turn resulted in the requirement that Smith dispose of its ash in a way other than that originally planned.

While in its complaint Smith alleged that it was the Corps that directed Smith to landfill its allegedly hazardous ash, Smith now concedes that it was the State of North Dakota Department of Health that prohibited it from landfilling the ash on the site where it was conducting its burn operation. Nonetheless, Smith maintains that the government is responsible for the additional cost of off-site landfilling because of the unexpected hazardous nature of the ash. According to Smith, "North Dakota concluded that there were enough 'suspected' contaminates remaining in the ash to require another burn/disposal plan."

The government argues that as a matter of law the contract made "disposal" Smith's responsibility, including disposal of the ash generated by Smith's self-designed disposal plan. In this connection, the government notes that under the contract's Scope of Work, "All demolition debris shall become the property of the contractor. It shall be the contractor's responsibility to remove from the site and properly dispose of all material.... All disposal fees are the respon-

sibility of the contractor." In addition, the government argues that there is no evidence to support Smith's contention that the ash was, in fact, "hazardous." To the contrary, the government has submitted unrefuted evidence that demonstrates that the ash was tested by the Department and found not to be hazardous.[10] Accordingly, the government argues, Smith is responsible for the costs associated with disposing of the ash. The government contends that Smith bore the risk of the state's refusal to allow it to bury the ash on site, and the Corps played no role in Smith's failure to secure a landfill permit from the state, which forced the contractor to dispose of the ash in an off-site landfill.

The court agrees that the government is entitled to summary judgment on this issue as well. The contract clearly provides that all debris became the property of the contractor following demolition, and further that the contractor had *sole* responsibility for disposal of "all materials." In this regard, the terms of the contract are unassailable, and there is no basis for recovery. Further, even if Smith's allegation that the government overlooked some hazardous materials that then made their way into the demolition debris, this was also Smith's responsibility. The contract specified that, "some propane cylinders and hazardous waste material may escape detection and be located in the debris. The contractor shall inform the COR immediately upon finding any hazardous material ... [and] shall set aside all hazardous materials."

It was Smith alone that devised the plan to burn the debris, there is no evidence that the debris was hazardous, and the Corps played no role in requiring Smith to change its disposal plans. As such, the government is entitled to summary judgment on this issue.

## CONCLUSION

For all the reasons discussed above, Smith has failed to raise any material facts that would preclude summary judgment for the government on the claims discussed herein.

---

**10.** *See* August 27, 1997 letter from Dana Mount, North Dakota Department of Health, to the Grand Forks Planning and Zoning Commission

("The Department's analysis of the ash samples collected from the site indicates that the material is below levels considered hazardous.").

Accordingly, the government's motion for partial summary judgment on these claims for equitable adjustment is **GRANTED**. Remaining before the court is the count in support of Smith's $12,408.23 claim for the alleged delay that Smith suffered as a result of the Corps' slow identification and removal of hazardous waste at some work sites.[11] The court will contact the parties during the week of May 28, 2001, to schedule a joint status conference to discuss resolution of this remaining claim for damages.

---

11.  *See* section II.A., *supra*.